J-S62013-14

2014 PA Super 224

COMMONWEALTH OF PENNSYLVANIA,

Appellee

v.

NASIR BUFORD,

Appellant

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 3297 EDA 2012

Appeal from the Judgment of Sentence entered July 23, 2012,
in the Court of Common Pleas of Philadelphia County,
Criminal Division, at No(s): CP-51-CR-0007423-2011

BEFORE: ALLEN, OLSON, and OTT, JJ.

OPINION BY ALLEN, J.:                          **FILED OCTOBER 08, 2014**

Nasir Buford, ("Appellant"), appeals from the judgment of sentence imposed following his conviction by a jury of first degree murder, possessing an instrument of crime, and violating the Uniform Firearms Act.[1]  We affirm.

The trial court provided the following background relative to this action:

> Appellant … appeals from this Court's judgment[] of sentence.  Following a jury trial before this Court, Appellant was found guilty of first Degree Murder, 18 Pa.C.S.A. §2502(a), Possessing an Instrument of Crime, 18 Pa.C.S.A. §907 (PIC) and a Violation of the Uniform Firearms Acts, 18 Pa.C.S.A. §§6106 (VUFA)[.]  The charges stemmed from the September 18, 2010 killing of twenty-one (21) year old Nathaniel Palmer ["decedent"] in an alleyway on the 1900 block of Bristol Street in Philadelphia.

---

[1] 18 Pa.C.S.A. §§2502(a), 907, and 6106, respectively.

Following the verdict the Court sentenced Appellant to Life Imprisonment for the murder conviction and lesser prison sentences for the remaining convictions. [FN1: The Court imposed prison sentences of three and a half (3½) to seven (7) years for VUFA, and one (1) to two (2) years for PIC.] All sentences were deemed to run concurrently. Timely Post Sentence motions were filed and denied. The instant timely appeal was filed.

Trial Court Opinion, 3/17/14, at 1. The trial court and Appellant have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

I. Is the appellant entitled to an arrest of judgment with respect to his convictions for murder of the first degree, firearms not to be carried without a license and possessing instruments of crime since the evidence is insufficient to sustain the verdicts of guilt as the Commonwealth failed to sustain its burden of proving the appellant's guilt beyond a reasonable doubt?

II. Is the appellant entitled to a new trial as a result of the trial court's error in denying his right to be present during the jury selection phase of the trial during which prospective juror no. 7 was questioned?

III. Is the appellant entitled to a new trial as a result of the trial court's ruling that allowed the Commonwealth to introduce the preliminary hearing testimony of Yvonne Ann Henderson?

IV. Is the appellant entitled to a new trial as a result of the trial court's ruling that allowed the Commonwealth to introduce that portion of the preliminary hearing testimony of Yvonne Ann Henderson with regard to her prior statement and identification of a photograph of "Flip?"

V. Is the appellant entitled to a new trial as a result of the trial court's ruling that allowed the Commonwealth to present the testimony of Dr. Edwin Lieberman concerning the results of an autopsy performed by Dr. Hunt?

VI. Is the appellant entitled to a new trial as a result of the trial court's ruling that allowed the Commonwealth to introduce the

prior statements of Commonwealth witnesses Derrick Michael Jackson and Ralph Smith as substantive evidence?

VII. Is the appellant entitled to a new trial as a result of the trial court's ruling that allowed the Commonwealth to present testimony from Detective Joseph Bamberski with regard to the statement [sic] of mind and out-of-court statements made by unavailable witness Yvonne Ann Henderson?

Appellant's Brief at 5-6.

Appellant's first issue challenges the sufficiency of the evidence supporting his convictions. Specifically, Appellant contends:

The Commonwealth's evidence failed to establish the appellant's identity as a shooter or as a participant in the incident resulting in the victim's death … Even if the Commonwealth did, in fact, prove the appellant's involvement in the crime, it failed to prove that the appellant acted with the specific intent to kill, malice or premeditation, that he fired weapon or that he was responsible for the victim's death. The Commonwealth's evidence in this regard was speculative, conjectural and inherently unreliable and did not sustain the Commonwealth's burden beyond a reasonable doubt.

Appellant's Brief at 20.

Further, Appellant maintains:

[T]he Commonwealth failed to sustain its burden of proving the appellant's guilt of a violation of the Uniform Firearms Act, 18 Pa.C.S.A. §6016. Barrel length is an essential element of the crime defined in 18 Pa.C.S.A. §6106. In this matter, the Commonwealth presented absolutely no evidence to establish barrel length.

*Id.* at 25-26 (citations omitted).

We recognize:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in

the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Jones*, 886 A.2d 689, 704 (Pa. Super. 2005) (citations omitted).

We have expressed:

Evidence is sufficient to sustain a conviction for first-degree murder where the Commonwealth has established that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the defendant committed the killing, and that the killing was deliberate. A specific intent to kill may be inferred from the defendant's use of a weapon on a vital part of the victim's body.

*Commonwealth v. Ramos,* 827 A.2d 1195, 1196 (Pa. 2003) (internal citations omitted).

Our crimes code defines possessing an instrument of crime as follows:

### § 907. Possessing instruments of crime

- 4 -

**(a) Criminal instruments generally.--**A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally.

**(b) Possession of weapon.--**A person commits a misdemeanor of the first degree if he possesses a firearm or other weapon concealed upon his person with intent to employ it criminally.

\*\*\*

**(d) Definitions.--**As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

\*\*\*

**"Instrument of crime."** Any of the following:

(1) Anything specially made or specially adapted for criminal use.

(2) Anything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have.

**"Weapon."** Anything readily capable of lethal use and possessed under circumstances not manifestly appropriate for lawful uses which it may have. The term includes a firearm which is not loaded or lacks a clip or other component to render it immediately operable, and components which can readily be assembled into a weapon.

18 Pa.C.S.A. § 907(a)-(b), and (d).

Moreover, the Uniform Firearms Act provides in pertinent part:

**§ 6106. Firearms not to be carried without a license**

**(a) Offense defined.--**

(1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or

fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

(2) A person who is otherwise eligible to possess a valid license under this chapter but carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license and has not committed any other criminal violation commits a misdemeanor of the first degree.

\*\*\*

**(e) Definitions.--**

(1) For purposes of subsection (b)(3), (4), (5), (7) and (8), the term "firearm" shall include any weapon which is designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of the weapon.

18 Pa.C.S.A. § 6106(a)(1)-(2), (e)(1) (footnote omitted).

Here, the trial court determined:

The evidence, viewed in the light most favorable to the Commonwealth[,] was as follows: on September 18, 2010 at about 1:27 a.m., Philadelphia Police Officer Ernest Tolan responded to a radio call for a person with a gun and was the first arriving officer at the 1900 Block of Bonitz Street in Philadelphia. He parked on the corner of Wayne Avenue and saw the decedent lying in the middle of the street. The [decedent] appeared to be shot multiple times and was unresponsive. As other arriving responders tended to the [decedent], Officer Tolan followed the blood trail to Bristol Street. There, he observed buildings that had bullet damage and saw a car with open windows. The smell of marijuana emanated from inside the car. N.T. 7/18/12, 80-90.

Dr. Edwin Lieberman testified that the [decedent] suffered three (3) gunshot wounds and also suffered blunt force trauma. One bullet entered the [decedent's] right shoulder and exited his back. That wound did not cause any significant trauma. Another bullet entered the [decedent's] back and exited the right shoulder. This shot caused a small fracture to the [decedent's]

arm. The third shot entered the [decedent's] chest piercing his lung. This shot caused severe blood loss which resulted in the [decedent's] death. All shots were from a distance greater than two and a half (2½) feet. Medical evidence could not determine the order of the shoots [sic]. Dr. Lieberman testified that after suffering these three bullet shots, a victim would have been able to run a distance until the loss of blood would cause the victim to pass out and die. The [decedent] also suffered a red abrasion on his right cheek, as if he had fallen. N.T. 7/18/12, 104-119.

Derrick Michael Jackson ["Jackson"], testified that he knew both Appellant and the decedent. The witness was present at the shooting scene, socializing with friends. He testified that he heard two (2) shots from the alleyway. He saw the decedent run and collapse. In his testimony he denied seeing the shooting. However, in a signed statement given to police just a few hours after the shooting, and introduced pursuant to Commonwealth v. Brady, 507 A.2d 66 (Pa. 1986) and Commonwealth v. Lively, 464 A.2d 7 (Pa. 1992), the witness gave a different version of the events. In that statement the witness told the detectives that Appellant, whom he knew as Flip, shot the decedent. He stated that prior to the shooting he was with the decedent, Appellant's older brother, whom he knew as Rafi and another person named Ralph Smith. They were drinking. [FN2: Fingerprints belonging to Ralph Smith and the decedent were obtained from cups recovered at the crime scene. A vodka bottle was also recovered. N.T. 7/18/12, 63-64.] The decedent briefly walked away into the alley to sell drugs to Yvonne Henderson ["Henderson"]. He then heard a "loud bang, bang and looked up." He saw a flash of a gun and saw Appellant shooting from the alley. [FN3: At trial, the witness acknowledged that he identified Appellant as the shooter in his police statement. N.T. 7/18/12, 168.] Jackson, along with the others ran and he eventually saw the decedent collapse. N.T. 7/18/12, 121- 153. (Testimony of [Jackson]); N.T. 7/19/12, 83- 98. (Testimony of Detective John Harkins)[.]

Ralph Smith ["Smith"] testified that he too was at the shooting scene, knew all the people who were at the scene but did not see the actual shooting. He testified that the car belonged to him. This witness also gave a signed statement to the detectives two (2) days after the shooting. In that statement he provided a much more detailed version of what he saw from when he first arrived at about 10 p.m. until the shooting three and a half (3½) hours later. Immediately before

the shooting he saw [Jackson] and Appellant's brother. He did not see Appellant. As Smith approached them, he saw the decedent walking towards the alley with [Henderson]. Gunshots rang out shortly thereafter and he, along with the others fled. N.T. 7/18/12, 185-226. (Testimony of [Smith]); N.T. 7/19/12, 140-158. (Testimony of Detective Levy Morton)[.]

[Henderson] died before the trial. However her preliminary hearing testimony was read to the jury. [Henderson], who lived down the block from Appellant[,] testified that she went to the alley to purchase drugs. She saw the decedent standing by a car and gave him $10. She saw Appellant pointing. Appellant turned and with an outstretched arm started shooting at the decedent. The decedent ran, knocking down [Henderson]. When she eventually got up the decedent was gone. N.T. 7/19/12, 25-36.

Crime Scene Police Officer Edward Fidler was dispatched to Bristol Street, which faced the alley way. He noticed bullet strike marks and holes outside 1912 Bristol [S]treet. Inside he recovered two (2) bullets. N.T. 7/19/12, 5-14. Police Officer Edward Nelson, a firearms expert examined the two recovered bullets. Although he was unable to determine whether they were fired from the same gun, he was able to determine that both were consistent with being fired from a revolver [FN5: Significantly, no shell casings were found at the shooting scene.], both had a similar pattern of lands and grooves, and both were of similar caliber. N.T. 7/19/12, 52-66. Stipulated evidence proved that Appellant was not licensed to carry a firearm. [FN6: N.T. 7/19/12, 171.]

Trial Court Opinion, 3/17/14, at 2-5.

Our review of the record confirms the trial court's recitation of the facts and evidence adduced at trial, and supports the trial court's determination that there was sufficient evidence to support Appellant's convictions.

Contrary to Appellant's contention, the Commonwealth's evidence was sufficient to establish that Appellant shot the decedent. Henderson's

preliminary hearing testimony was read to the jury as discussed more fully below. N.T., 7/19/12, at 25-49. Henderson identified Appellant, her neighbor, as the decedent's shooter. *Id.* at 28-31. At trial, Jackson testified that he had recently reviewed the statement that he provided to law enforcement following the shooting. N.T., 7/18/12, at 129, 131. Jackson "recall[ed] [that] that's what [he] told the Homicide detectives back on September 18, 2010[.]" *Id.* at 129. Jackson further testified that he "signed that statement" along with the photographs that he was shown by law enforcement. *Id.* at 131. Jackson confirmed that in his statement to law enforcement in the hours following the shooting, he stated that he witnessed Appellant shoot decedent, and provided a description of Appellant. *Id.* at 134-135.

Dr. Lieberman, a medical examiner with 22 years of experience, testified that he had reviewed "the medical examiner's case file [regarding decedent's autopsy] … the photographs taken during the autopsy, the actual clothing worn by the decedent, as well as other records contained in the file." *Id.* at 105-106. Dr. Lieberman provided expert medical testimony that the decedent sustained three gunshot wounds to his right shoulder, his back, and his lung. *Id.* at 109-118. Dr. Lieberman further testified that Appellant "died as a result of the gunshot wounds." *Id.* at 118.

Viewing the evidence adduced at trial in the light most favorable to the Commonwealth, the jury could have concluded that the Commonwealth "established that [Appellant] acted with a specific intent to kill, that a human

- 9 -

being was unlawfully killed, that [Appellant] committed the killing, and that the killing was deliberate." **See Ramos,** 827 A.2d at 1196. Likewise, the jury could have concluded that Appellant's specific intent to kill could be inferred "from [Appellant's] use of a weapon on a vital part of [decedent's] body." **Id.** Accordingly, we find that there was sufficient evidence to support Appellant's conviction for first degree murder. **See Commonwealth v. Johnson,** 985 A.2d 915, 923 (Pa. 2009) (affirming conviction for first degree murder where defendant was identified as person who intentionally and deliberately shot victim multiple times causing victim's death).

Further, the record viewed in the light most favorable to the Commonwealth, supports Appellant's convictions for possessing an instrument of crime and for violating the Uniform Firearms Act. *See* 18 Pa.C.S.A. §§ 907 and 6106, respectively. At trial, the jury heard testimony that the crime scene evidence, as analyzed by firearms expert Police Officer Nelson, involved two bullet "specimens" which were "consistent with revolver-type ammunition." N.T., 7/19/12, at 55, 62. Officer Nelson based his opinion on "the caliber, the design of the bullet, the length of it, what we call the cannelure. They both had a knurled cannelure[, meaning]…a circumferential groove around it. These are things characteristic of revolver-type ammunition." *Id.* at 62. Officer Nelson showed the jury examples of a revolver and a semi-automatic pistol. *Id.* at 62-63. Officer Nelson testified that "[m]any people associate [a revolver handgun] with old western-type

movies or older firearms." *Id.* at 63. Moreover, Appellant's counsel stipulated that Appellant was not licensed to carry a firearm. Based on the foregoing evidence viewed in the light most favorable to the Commonwealth, the jury could have reasonably concluded that the weapon used by Appellant to shoot the decedent was a revolver-type firearm, which Appellant was not licensed to carry, in violation of 18 Pa.C.S.A. §§ 907 and 6106. Indeed, in **Commonwealth v. Woodbury,** 477 A.2d 890 (Pa. Super. 1984), we held that a conviction for possessing an instrument of crime can be sustained even if it is based on circumstantial evidence. Specifically, we explained:

> The only evidence in support of the accusation of possession was purely circumstantial. However, once the factfinder concluded that the appellant was the slayer and that the death resulted from the infliction of a gunshot wound, the factfinder could logically have concluded from all of the evidence that appellant had possession of a gun, that the gun was an instrument commonly used for criminal purposes, and that his possession of the gun was, under the circumstances, not manifestly appropriate for any lawful use that the gun may have had. *See Commonwealth v. Keaton,* 276 Pa. Super. 518, 522, 419 A.2d 578, 580 (1980), where a conviction for [possessing an instrument of crime] was upheld based only upon circumstantial evidence and with an absence of any direct evidence of actual physical possession of the weapon. Therefore, appellant's conviction for this offense was grounded upon competent evidence. The evidence brought out during the course of the trial is sufficient to sustain both the conviction for murder in the third degree and the conviction for possession of an instrument of crime.

*Id.* at 893-894 (footnote omitted). Accordingly, we find that Appellant's sufficiency claims are without merit.

Appellant's second issue contends that he is "entitled to a new trial as a result of the trial court's error in denying his right to be present during the jury selection phase of the trial during which prospective juror no. 7 was questioned." Appellant's Brief at 27.

Our Supreme Court has explained:

> The purpose of *voir dire* is to provide an opportunity to counsel to assess the qualifications of the prospective jurors to serve. It is therefore appropriate to use such an examination to disclose fixed opinions or to expose other reasons for disqualification. *Commonwealth v. Drew,* 500 Pa. 585, 588, 459 A.2d 318, 320 (1983) (citing *Commonwealth v. Johnson,* 452 Pa. 130, 305 A.2d 5 (1973)). *See also Commonwealth v. Lopinson,* 427 Pa. 284, 234 A.2d 552 (1967) *and Commonwealth v. McGrew,* 375 Pa. 518, 100 A.2d 467 (1953). It is well settled that the sole purpose of examination of jurors under *voir dire* is to secure a competent, fair, impartial and unprejudiced jury.

**Commonwealth v. Ellison,** 902 A.2d 419, 423-424 (Pa. 2006).

Moreover, our Supreme Court recently observed:

> The right to trial by jury is guaranteed by the Sixth Amendment to the U.S. Constitution and by the Pennsylvania Constitution, Article I, Section 6 and Section 9. A defendant's right to be present at his or her trial is grounded in the Confrontation Clause of the Sixth Amendment and in the Due Process Clauses of the Fifth and Fourteenth Amendments. The United States Supreme Court has determined that "[o]ne of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial." *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (citing *Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892)). In addition, the High Court "has assumed that, even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against

- 12 -

the charge.... Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (quotation marks and internal citation omitted).

The High Court has explicitly affirmed that *voir dire* is a critical stage of the criminal proceeding, during which the defendant has a constitutional right to be present. *Gomez v. United States,* 490 U.S. 858, 873, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) (citing *Lewis, supra* at 374, 13 S.Ct. 136). The determination that *voir dire* is a critical stage of trial flows directly from the recognition that a defendant's "life or liberty may depend upon the aid which, by his personal presence, he may give to counsel and to the court and triers in the selection of jurors." *Lewis, supra* at 373, 13 S.Ct. 136. However, certain decisions regarding the conduct of *voir dire* are properly made by counsel alone. *See, e.g., Gonzalez v. United States,* 553 U.S. 242, 128 S.Ct. 1765, 170 L.Ed.2d 616 (2009) (holding that defense counsel may decide whether to consent to *voir dire* proceedings before a federal magistrate).

The High Court has also stated:

The mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication.

*U.S. v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985).

Article I, § 9 of the Pennsylvania Constitution and Pennsylvania Rule of Criminal Procedure 602 guarantee the right of an accused to be present in the courtroom at every stage of a criminal trial. *Commonwealth v. Rompilla,* 554 Pa. 378, 721 A.2d 786, 793 (1998); *Commonwealth v. Ford,* 539 Pa. 85, 650 A.2d 433, 440 (1994). Rule 602(a) provides that "[t]he defendant shall be present at every stage of the trial including the impaneling of the jury...." As we have recently determined, this rule "plainly states that the defendant has the right to observe every phase of the trial, including the impaneling of the

jury." *Williams, supra* at 618. In addition, the jury selection process is crucial to the preservation of the right to an impartial jury as guaranteed by Article I, § 9 of the Pennsylvania Constitution. *Commonwealth v. Ingber,* 516 Pa. 2, 531 A.2d 1101, 1102 (1987).

However, like the U.S. Supreme Court, this Court has recognized that the right to be present in the courtroom during one's trial is not absolute. This Court has stated that a "defendant's presence in chambers and at sidebar is not required where he is represented by counsel." *Commonwealth v. Boyle,* 498 Pa. 486, 447 A.2d 250, 253 (1982). In *Boyle,* the appellant challenged the trial court's denial of a recusal motion, citing the appellant's exclusion from sidebar and in-chambers conferences as evidence of judicial prejudice. We determined that there was no merit to the appellant's assertions, noting that defense counsel was present at the conferences and had an unconstrained right to confer with his client. *Id.* at 252–53 & n. 7. *See also Commonwealth v. Proctor,* 526 Pa. 246, 585 A.2d 454, 460 (1991) (affirming the denial of relief after the trial court reseated an erroneously dismissed juror, after discussion with counsel but outside the defendant's presence).

\*\*\*

**[W]e conclude that although a defendant has the clear right to participate in the jury selection process, that right is not compromised where, as here, the defendant, who was in the courtroom, was not present at sidebar where his counsel was questioning several venirepersons outside the range of his hearing. We reach this conclusion because, like other jurisdictions, we recognize that a defendant's right to participate in *voir dire* may be satisfied through procedures that both ensure the defendant's right to choose and be tried by a fair and impartial jury, yet make accommodations for trial court efficiency and safety, and the comfort, protection, and respect for the jury pool. Nothing in the federal or state constitutions, and nothing in Pa.R.Crim.P. 602(a), requires a contrary result. We recognize and reaffirm, as other jurisdictions have done, that trial courts are in the best position to determine how to proceed in each case and how to strike the appropriate balance. We hold that where some questioning of venirepersons occurs at sidebar and outside of the defendant's hearing, the**

- 14 -

**defendant's consultation with his or her counsel regarding these proceedings may certainly serve as an adequate basis upon which to conclude that the defendant's right to be present during jury impanelment has been respected.**

***Commonwealth v. Hunsberger,*** 58 A.3d 32, 37-40 (Pa. 2012) (footnote omitted) (emphasis supplied).

Appellant asserts that ***Hunsberger*** is distinguishable in this case, and argues:

> In Hunsberger, prospective jurors were questioned in the defendant's presence, but out of his hearing. The defendant participated in the questioning and/or selection of these prospective jurors since the record showed that the defendant consulted with the trial counsel during the questioning and selection of these jurors.
>
> In the instant matter, the appellant's trial counsel objected to questioning of prospective Juror no. 7 in his absence. The questioning of this prospective juror did not take place in the appellant's presence, but in the trial judge's robing room out of the sight and hearing of the appellant. Moreover, the record does not reflect whether trial counsel ever consulted with the appellant concerning prospective Juror no. 7.

Appellant's Brief at 31. We do not agree with Appellant.

Our review of the record reveals that Appellant was present when the trial court began its examination of the venirepersons. Indeed, the trial court personally addressed Appellant to advise him that it was the trial court's "practice to introduce [Appellant], as well as all counsel" to the venirepersons. N.T., 7/16/12, at 3. Likewise, Appellant was present when the trial court explained to the venirepersons the following courtroom procedure:

[I]f for some reason, ladies and gentlemen, one of these questions [from the jury questionnaire] that I ask of you is something that you would like to discuss in private and not in front of the entire jury panel, then all you need to do is say that to the Court and then you have to give us a minute or two. What will then happen is we'll go through that door to the robing room, the stenographer and the attorneys and I will set up; and then that juror will be brought to the back and questioned out of the hearing of the other members of the panel.

*Id.* at 8.

Appellant was also present when the trial court began its examination of prospective juror no. 7, and the potential juror revealed that her son had been the victim of a crime involving a weapon. Specifically, the following exchange occurred:

[Trial] Court: [] Juror number seven, you indicated that you or someone close to you had been the victim of a crime?

Prospective Juror 7: Yes.

[Trial] Court: The person's relationship to you and the crime?

Prospective Juror 7: My son.

[Trial] Court: And what was the crime?

Prospective Juror 7: He was robbed.

[Trial] Court: I am sorry to hear that. Was a weapon used?

Prospective Juror 7: He didn't say.

[Trial] Court: Was he injured in any way?

Prospective Juror 7: Yes.

[Trial] Court: How was he injured?

Prospective Juror 7: Well, when he tried to finally get away, he fell and that's when they, a gang of them had robbed him of his school bag, went through his pockets.

[Trial] Court:  I am very sorry to hear that.  Did he have to go to the hospital as a result of this?

Prospective Juror 7:  He wouldn't tell me that.

[Trial] Court:  Now, obviously, as a mother, this is a very upsetting thing to happen to someone that you care about.  Did he report this to the police?

Prospective Juror 7:  Yes.

[Trial] Court:  Was anyone ever arrested?

Prospective Juror 7:  Not that I know of.

[Trial] Court:  Now, because of this experience, do you hold any prejudice for or against the police department or the justice system as a whole because your son was th[e] victim of a robbery and assault and no one was ever apprehended?

Prospective Juror 7:  No.

*Id.* at 29-30.

The trial court then questioned prospective juror no. 7 regarding her "education and training past high school" and whether she had taken "any classes that were law or law related[.]"  *Id.* at 30.  Prospective juror no. 7 asked the trial court, "can we talk in private?"  *Id.* at 31.  The following discussion ensued:

[Trial] Court:  Certainly.  It will just—you just have to give us a minute.  If the stenographer will set up in the back and I will see counsel.

As soon as we are set up, we will bring you into the back. Okay.

---

(Whereupon, the following took place in the Judge's robing room.)

- 17 -

[Appellant's counsel]: I just have to note a timely objection because my client, he obviously can't be present for this.

[Trial] Court: No. In regards to the sidebars, because of the security, your client cannot be present. Your objection is noted and I would direct you to relay to him any answer to this, the additional questions.

---

(Whereupon, prospective juror number 7 enters the robing room.)

---

[Trial] Court: All right. So juror number seven, in regards to your legal training, you asked to see us at sidebar. What type of specialized legal training do you have?

Prospective Juror 7: Okay. I work for the Department of Homeland Security, ICE, but every now and then we have to take training, mandatory training for our job.

[Trial] Court: All right. So, let me ask you this, because, obviously you are in a high security position. I see that you work for deportation and removal of—this is of people involved as immigrants or in terrorist issues?

Prospective Juror 7: Both.

[Trial] Court: Both. So, obviously, you have regular contact with members of law enforcement both on the state, federal, and local issue?

Prospective Juror 7: Yes, ma'am.

[Trial] Court: So here is what I want to know: Because you work in an, obviously, very—we appreciate your, the work that you do.

Prospective Juror 7: Thank you.

[Trial] Court: Is there anything about the nature of that work that you think would impact your ability to be a fair juror in this case?

Prospective Juror 7: No.

- 18 -

[Trial] Court: [] What I want to know is if I instruct you on the law and I tell you what it is, do you understand that you have to apply the law as I give it to you, not any law that you know, think you know, may have been—may have studied, tested on or discussed in a classroom, would you be able to follow my instructions on the law?

Prospective Juror 7: Yes, uh-huh.

[Trial] Court: Okay. And how long have you worked in your capacity for Homeland Security and the other agencies?

Prospective Juror 7: I've been with Homeland Security for 15 years, and the Department of Defense for 16 years.

*** 

[Trial] Court: Okay. So, counsel, you may, if you have additional questions, [Appellant's counsel], you may ask those questions.

[Appellant's counsel]: Yes. You said [you are a] deportation and removal assistant. If you could just elaborate a little bit on—

Prospective Juror 7: Okay. That's my title. Well, I mainly work in administrative, timekeeper, purchases and maybe moving some files every now and then. I have contact with who we bring in.

[Appellant's counsel]: Okay. That's all.

*Id.* at 31-34.

Consonant with **Hunsberger,** we find that the trial court was "in the best position to determine how to proceed" regarding prospective juror no. 7's request for a private discussion. **Hunsbereger,** 58 A.3d 40. We further find that the trial court did not abuse its discretion in determining that "because of security" Appellant would not be in the robing room. N.T., 7/16/12, at 31. Moreover, Appellant's counsel was present during the *in*

- 19 -

*camera* examination of prospective juror 7, and questioned her after the trial court concluded its own examination. *Id.* at 31-34. Further, while Appellant argues that "the record does not reflect whether trial counsel ever consulted with the appellant concerning prospective Juror no. 7," the record clearly reflects that Appellant's trial counsel was specifically "direct[ed] to relay to [Appellant] any answer" and information received from prospective juror no. 7 during the *in camera* examination. Appellant's Brief at 31; N.T., 7/16/12, at 31.

Appellant's counsel was afforded "an opportunity … to assess the qualifications of the prospective juror[] to serve." **Ellison, supra,** at 423-424. We are not persuaded that Appellant's absence from the *in camera* examination of prospective juror no. 7 resulted in Appellant being tried before an incompetent, unfair, partial and prejudiced jury. **Id.** Appellant was present during the rest of the jury selection process. Accordingly, applying the rationale espoused by our Supreme Court in **Ellison** and **Hunsberger**, we find that Appellant's challenge to his absence from the *in camera* examination of prospective juror no. 7 is unavailing.

Appellant's third and fourth claims of error challenge the admission of Henderson's preliminary hearing testimony, including references to the portion of Henderson's statement to law enforcement which "made reference to a photographic identification of an individual known as 'Flip,' presumably the appellant … [because] Henderson never indicated that 'Flip' was the individual responsible for the death of the victim." Appellant's Brief at 33,

45. "A ruling on the admissibility of evidence will only be reversed upon a showing that the trial court abused its discretion." ***Commonwealth v. Kunkle,*** 79 A.3d 1173, 1179 (Pa. Super. 2013) (internal citations and quotations omitted).

Instantly, the trial court determined:

> Appellant, under two separate theories, challenges this Court's ruling permitting the use of [Henderson's] preliminary hearing testimony. He first claims that he did not have a full and fair opportunity to cross examine her at the preliminary hearing. He also objects to the admissibility of certain portions of her testimony concerning a prior statement and an identification of Appellant's photograph. The exception to the hearsay rule which permits the admission of an unavailable witness's prior preliminary hearing testimony "is 'predicated on the "indicia of reliability" normally afforded by adequate cross-examination. But where . . . that indicia of reliability' is lacking, the exception is no longer applicable." Commonwealth v. Bazemore, 614 A.2d 684, 687 (Pa. 1992), quoting Commonwealth v. Mangini, 425 A.2d 734, 739 (Pa. 1981). Therefore, "in order for prior testimony to be admissible in a subsequent proceeding as substantive evidence against the accused, there must have been a 'full and fair opportunity to cross-examine.'" Commonwealth v. Thompson, 648 A.2d 315, 322 (Pa. 1994), quoting Commonwealth v. Bazemore, supra at 687. "The Commonwealth may not be deprived of its ability to present inculpatory evidence at trial merely because the defendant, despite having the opportunity to do so, did not cross-examine the witness at the preliminary hearing stage as extensively as he might have done at trial." Commonwealth v. Thompson, supra (footnote omitted). However, where the defense, at the time of the preliminary hearing, was denied access to vital impeachment evidence, such as prior inconsistent statements of the witness or the witness's criminal record, a full and fair opportunity to cross-examine the unavailable witness may be deemed to have been lacking at the preliminary hearing. Commonwealth v. Smith, 647 A.2d 907, 911-915 (Pa. Super[.] 1994).
>
> The record of the preliminary hearing discloses that prior to the preliminary hearing, counsel was provided with the

witness prior statement and with the witness arrest record.  N.T. 6/28/2011, 4.  We reviewed the substance of the preliminary hearing and determined that counsel was accorded full and fair cross examination of the witness.  We find no errors concerning the use of any prior statements.  We also note that the witness knew Appellant as they lived near each other.  Accordingly any challenge to the identification of his photo is baseless.  Therefore Appellant's challenges to the admissibility of these [sic] testimony fails under both theories.

Trial Court Opinion, 3/17/14, at 6-7 (footnotes omitted).

The record and applicable jurisprudence supports the trial court's admission of Henderson's preliminary hearing testimony as substantive evidence, which includes Henderson's identification of Appellant in her law enforcement statement.  At the preliminary hearing, the Commonwealth asserted that Appellant's "[c]ounsel has been provided a copy of [Henderson's] statement, as well as her FBI [extract] for purposes of preservation."  N.T., 6/28/11, at 4.  Appellant's counsel at the preliminary hearing did not deny the Commonwealth's assertion that those materials had been provided to him.  *Id.*  We further note that Appellant's preliminary hearing counsel did not assert to the trial court that there was any outstanding discovery which would prevent him from conducting a full and fair cross-examination of Henderson.  *Id.* 3-34.  During direct examination, Henderson explained that she had known Appellant, a.k.a Flip, for approximately two to three years.  *Id.* at 6, 13.  Henderson testified that she and Appellant live on "the same block."  *Id.* at 8.  Henderson described Appellant point and shoot at decedent.  *See id.* at 9-11.  During Henderson's testimony, the Commonwealth provided Henderson with a copy of

Henderson's statement to law enforcement "the night that this happened." *Id.* at 16-17. The Commonwealth reiterated that Appellant's preliminary hearing counsel "has a copy [of Henderson's statement to law enforcement], as well as any relevant [FBI] extracts." *Id.* at 17. Henderson testified she had initialed and signed her statement to law enforcement, had signed a page with Appellant's picture and written the name "Flip" on it, and had signed a separate document indicating she had "adopted" her statement to law enforcement. *Id.* at 17-18. Henderson admitted that the statement to law enforcement contained her "words when [she] talked to Homicide," and that she told them "what [she] saw" and "who [she] saw do it." *Id.* at 18-19. Henderson denied that "anyone force[d] her to say anything[.]" *Id.* at 19.

Appellant's preliminary hearing counsel cross-examined Henderson about 1) her being a crack addict; 2) her efforts to reach Appellant to buy drugs from him; 3) her drug sale with decedent after she could not reach Appellant; 4) her topics of conversation with decedent during the drug transaction; 5) her drug and alcohol use the evening of the shooting; 6) her vision and her use of reading glasses; 7) what Henderson heard prior to the shooting; 8) Appellant's position in the alley before the shooting; 9) the lighting in the alley and Henderson's lack of flashlight; 10) what Appellant was wearing; 11) the length of time Appellant stood in the alley prior to the shooting; 12) Henderson's position in the alley prior to the shooting along with the decedent's position vis á vis Henderson; 13) decedent's height; 14)

what Henderson observed after the shooting; 15) her actions following the shooting; 16) her failure to tell law enforcement at the crime scene that Appellant had perpetrated the shooting; 17) and her fear of Appellant and "everybody" following the shooting. *Id.* at 19-30. After the Commonwealth re-examined Henderson, Appellant's preliminary hearing counsel asserted to the trial court that **"[f]or the purpose of this hearing, I don't have any other questions."** *Id.* at 32 (emphasis supplied).

At trial, Appellant's trial counsel "stipulated … that [Henderson] is deceased." N.T., 7/16/12, at 3. The trial court colloquied Appellant regarding this stipulation, and Appellant affirmed that he "accept[ed] that stipulation[.]" *Id.* at 4. Accordingly, Henderson's unavailability is undisputed. Appellant's trial counsel conceded that "I have nothing to disprove that [Appellant's preliminary hearing counsel] did, in fact, receive the notes of testimony" concerning Henderson. *Id.* at 5. In arguing against the admission of Henderson's preliminary hearing testimony, Appellant's trial counsel complained that Appellant's preliminary hearing counsel did not have "available to him [the] physical evidence to corroborate [Henderson's] statement such as her phone records where she makes reference to making a phone call to both [Appellant] and to the decedent." *Id.* Appellant's trial counsel further argued that Appellant's preliminary hearing counsel did not have "the rest of the discovery," which deprived Appellant's preliminary hearing counsel from having "an idea of what other witnesses would say comparable to [Henderson]." *Id.* at 5-6.

In admitting Henderson's preliminary hearing testimony, the trial court reasoned:

> The Court will note that I have read the preliminary hearing notes of June 28th of 2011, that there was extensive direct and cross [examination] of [Henderson], there was a copy of the FBI extract and the statement [Henderson gave to law enforcement [was] provided [to counsel]…[.] [S]o after review of the notes [of testimony,] the Court finds that there was a full and fair cross-examination of [Henderson], that the notes were properly preserved, that [Appellant] was present, and therefore, was able to confront the witness and consult with his attorney and that the Commonwealth may, in fact, use the notes of [Henderson's] testimony at the trial.

*Id.* at 6-7.

Based on our review of the preliminary hearing and decisional law, we find that the trial court did not abuse its discretion in admitting at trial Henderson's preliminary hearing testimony, which included references to her identification of Appellant in her law enforcement statement. Henderson, who had known Appellant for approximately two to three years, was clearly unavailable, her criminal record and statement to law enforcement had been provided to Appellant's preliminary hearing counsel, and Appellant's preliminary hearing counsel had a full and fair opportunity to cross-examine Henderson. N.T., 6/28/11, 4-32; *see Commonwealth v. McCandless,* 728 A.2d 713, 721 (Pa. Super. 2001) (admitting preliminary hearing testimony of a deceased witness at a second trial regarding whom appellant had a full and fair opportunity to cross-examine at the preliminary hearing); *see also* Appellant's Brief at 40 *relying on Commonwealth v. Rodgers,*

372 A.2d 771 (Pa. 1977) ("[I]t is well settled that an unavailable witness' prior recorded testimony from a preliminary hearing is admissible at trial and will not offend the right of confrontation, provided the defendant had counsel and a full opportunity to cross-examine that witness at the prior proceeding."). Therefore, we find that Appellant's third and fourth claims of error are without merit.

Appellant's fifth issue challenges the admission of Dr. Lieberman's testimony "since he did not perform the autopsy on the victim's body." Appellant's Brief at 47. Specifically, Appellant contends:

> Herein, Dr. Lieberman was called at trial as an expert in forensic pathology. He was called as a witness due to the fact that Dr. Hunt, the medical examiner who performed the autopsy was no longer employed by the Medical Examiner's Office in Philadelphia and it was claimed that [Dr. Hunt] was not available to testify. Dr. Lieberman testified that he reviewed the file. Dr. Lieberman apparently agreed with the findings contained in Dr. Hunt's report.
>
> ***
>
> Dr. Lieberman's testimony was essentially hearsay. The admission of inadmissible hearsay must always equate with the denial of the right of confrontation. The fact that Dr. Lieberman was qualified and testified as an expert in forensic pathology does not cure the denial of the appellant's right to confront Dr. Hunt.

*Id.* at 50. Appellant further contends that "[p]rovisions have to be made to assure that the medical examiner who performed the autopsy is returned to Philadelphia in the criminal prosecution." *Id*. We disagree.

In rebutting this claim of error, the trial court explained:

Appellant challenges the testimony of Dr. Lieberman because he did not conduct the actual autopsy. The autopsy was conducted by former Medical Examiner, Dr. Hunt, who by the time of trial was with the Riverside, California Medical Examiner's Office. N.T. 7/18/12, 105. Dr. Lieberman, who at the time of trial was a Philadelphia Medical Examiner for 22 years, testified that prior to his testimony he reviewed Dr. Hunt's complete report, the photographs taken during the autopsy, the actual clothing worn by the decedent and other documents contained in the Medical Examiner's file. N.T. 7/18/12, 104-106. Contrary to Appellant's assertion, the record is clear that Dr. Lieberman did not simply recite the opinion of Dr. Hunt. His testimony was based upon his own conclusions after his own independent review of the file. This was demonstrated beyond any dispute as he found an error in Dr. H[u]nt's initial report. Dr. Hunt's report indicated that one of the bullet wounds traveled right to left. Dr. Lieberman testified that it was an error and that bullet traveled left to right. N.T. 7/18/12, 109. Accordingly, this claim too must be rejected.

Trial Court Opinion, 3/17/14, at 7-8. We agree with the trial court. **See**

**Commonwealth v. Ali,** 10 A.3d 282, 306 (Pa. 2010) (post-conviction relief

for ineffective assistance of counsel denied for counsel's failure to seek a

mistrial after medical examiner who did not author autopsy report testified;

*inter alia*, prior jurisprudence held that "a medical expert who did not

perform the autopsy may testify as to cause of death as long as the

testifying expert is qualified and sufficiently informed") **citing**

**Commonwealth v. Smith,** 391 A.2d 1009 (Pa. 1978) and

**Commonwealth v. Mitchell,** 570 A.2d 532 (Pa. 1990).

Likewise, in **Commonwealth v. Reed,** 645 A,2d 872 (Pa. 1994), we

observed:

Appellant contends, first, that trial counsel was ineffective for failing to object to the testimony of Dr. Joshua Perper, the

Allegheny County coroner, concerning the cause of death of the victim, Thomas Law. Dr. Catherine Janosz, a former employee of the coroner's office, performed the autopsy on the victim, and Dr. Perper's testimony concerning the cause of death was based on his review of the report of Dr. Janosz, who did not testify. Appellant maintains that Dr. Janosz's report was hearsay and that the admission of Dr. Perper's testimony as to the contents of that report caused appellant to be denied his right of cross-examination.

**Reed**, 645 A.2d at 880. Relying on **Mitchell**, we denied post-conviction relief for ineffective assistance of counsel, and noted:

> In *Commonwealth v. Mitchell,* 391 Pa. Super. 100, 570 A.2d 532 (1990), *appeal denied,* 527 Pa. 599, 589 A.2d 689 (1990), a panel of this Court considered the claim of appellant, who had been convicted of first degree murder, that his trial counsel was ineffective for failing to object to the testimony of the medical examiner, Dr. Catherman, concerning the manner and cause of the victim's death. Dr. Catherman based his testimony on autopsy reports prepared by Dr. Carpenter, who was unavailable because he had moved out of the country. Judge Olszewski, the author of the lead opinion, concluded that the testimony was properly admitted and that trial counsel was therefore not ineffective for failing to object to it.

**Reed, supra,** at 880. Given the foregoing, we find Appellant's challenge to the admission of Dr. Lieberman's testimony to be unavailing.[2]

Appellant's sixth issue challenges the trial court's admission of Jackson's and Smith's prior police statements, which were inconsistent with their trial testimony. Appellant contends:

_____

[2] The fact that the procedural posture of this direct appeal differs from the post-conviction relief posture of **Ali** and **Reed, supra,** does not affect our analysis.

At trial, neither Jackson nor Smith claimed to have witnessed the shooting. Neither Jackson nor Smith adopted their statements as required by <u>Lively</u> [infra]. Moreover, the detective who interviewed Jackson was not call[ed] as a witness at trial since he was on vacation at the time. Clearly, the statements of Jackson and Smith could not be considered as substantive evidence.

Appellant's Brief at 54. We disagree.

Pennsylvania Rule of Evidence 803.1 governs the admission of prior inconsistent statements, and provides in pertinent part as follows:

**Rule 803.1. Exceptions to the Rule Against Hearsay-- Testimony of Declarant Necessary**

The following statements are not excluded by the rule against hearsay if the declarant testifies and is subject to cross-examination about the prior statement:

**(1) Prior Inconsistent Statement of Declarant-Witness.** A prior statement by a declarant-witness that is inconsistent with the declarant-witness's testimony and:

(A) was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition;

(B) is a writing signed and adopted by the declarant; or

(C) is a verbatim contemporaneous electronic, audiotaped, or videotaped recording of an oral statement.

Pa.R.E. 803.1(1).

Our Supreme Court explained:

In *Commonwealth v. Brady,* 510 Pa. 123, 507 A.2d 66 (1986), we reconsidered the longstanding rule that prior inconsistent statements of a non-party witness could only be used to impeach the credibility of the witness, not as substantive evidence to prove the truth of the matters asserted therein. We were persuaded to adopt the developing view that such statements may be used as substantive evidence where the

declarant is a witness at trial and available for cross-examination.

In *Brady,* the defendant was convicted of second degree murder, burglary and criminal mischief for the stabbing death of a security guard. The defendant's girlfriend, Tina Traxler, was interviewed by the police on the day of the murder. Traxler first told the police that she and the defendant were riding in a car that became stuck in a ditch near the manufacturing plant where the security guard was employed. When she accompanied the police to the area, however, Traxler admitted that they had entered the plant and that her boyfriend had stabbed the security guard.

Traxler agreed to make a tape-recorded statement when she returned to the police station. In her recorded statement, she identified her boyfriend as the perpetrator of the crimes. She stated that they had entered the plant and that her boyfriend had stabbed the security guard when he surprised them while they were attempting to pry open a dollar bill change machine.

Traxler recanted her tape-recorded statement when called as a witness by the Commonwealth at trial. She denied that she and her boyfriend had entered the plant. Traxler admitted that she had given the statement to the police, but explained the discrepancies by claiming that she was afraid of the police and had told them what they wanted to hear. The Commonwealth was permitted to introduce the tape-recorded statement as substantive evidence to prove the truth of the matters asserted and the jury was instructed that the statement could be considered for that purpose.

We held that the tape-recorded statement was properly admitted as substantive evidence because the statement was rendered under highly reliable circumstances assuring that it was voluntarily given. Furthermore, the witness was subject to cross-examination as to the validity of each statement. The jury had the opportunity to observe the demeanor of the witness and to assess her credibility.

We did not address in *Brady* under what circumstances a prior inconsistent statement would be considered highly reliable so as to render the statement admissible as substantive evidence. The issue was subsequently addressed in *Commonwealth v. Lively,* 530 Pa. 464, 610 A.2d 7 (1992). We

- 30 -

held that a prior inconsistent statement by a non-party witness shall be used as substantive evidence only when it was given under oath at a formal legal proceeding, or the statement was reduced to a writing signed and adopted by the declarant, or the statement was recorded verbatim contemporaneously with the making of the statement.

\*\*\*

[] By restricting such use of prior inconsistent statements to those given under oath at a formal proceeding, or reduced to a writing signed and adopted by the witness, or which are contemporaneous verbatim recordings of a witness's statements, we intended "to ensure that only those hearsay declarations that are demonstrably reliable and trustworthy [will be] considered as substantive evidence...." 530 Pa. at 471, 610 A.2d at 10.

***Commonwealth v. Wilson,*** 707 A.2d 1114, 1115-1117 (Pa. 1998).

In admitting the prior inconsistent statements of trial witnesses who recanted their prior statements in a first degree murder trial, our Supreme Court reasoned:

Our Court has, thus, fully embraced the view that it is the finder-of-fact's ability to make in-person observations of the witness at the time of trial, as he or she explains the reasons for the prior statement, which is most crucial to its assessment of the witness's credibility. We have determined that it is the "great engine of cross examination" which furnishes the best method by which the witness's motives for changing his or her story, from that given previously, may be fully and thoroughly explored, and, correspondingly, it is the best means to furnish the finder-of-fact with a sound basis by which it may discern which of the two tales told by the witness is worthy of belief.

\*\*\*

Our Court's decision in *Brady,* … acknowledges the practical reality that, for the trial process to function in the manner it was intended, i.e., as a vehicle for the discovery of truth, prior inconsistent statements of a testifying witness bearing on the matter in controversy are valid probative evidence that the finder-of-fact should not only be permitted to

hear, but also, vitally necessary for it to consider if it is to render a sound ultimate decision.

\*\*\*

[S]ince the out-of-court statements of Garvin, Lawrence and Lanier to the police were reduced to writing, and each of these individuals, by their own admission, signed every page of their statements and, also, the attestation statements at the end which declared that the information in the statements was accurate, all three statements were properly admitted as substantive evidence under Pa.R.E. 803.1(1). Garvin, Lawrence and Lanier were thoroughly tested through cross-examination at Appellant's trial, so that the jury had the opportunity to observe these witnesses as they repudiated their out-of-court statements, and to assess the credibility of their explanations for the repudiations. Further, the three out-of-court statements were fundamentally consistent with one another in recounting the same narrative of the manner in which the shooting transpired and in describing similar essential details; thus, they were not so patently unreliable so as to render a jury verdict based upon them one of pure conjecture.

***Commonwealth v. Brown,*** 52 A.3d 1139, 1169-1171 (Pa. 2012).

Here, as the trial court correctly observed, "both statements properly were admitted pursuant to Commonwealth v. Brady, 507 A.2d 66 (Pa. 1986) and Commonwealth v. Lively, 464 A.2d 7 (Pa. 1992)." Trial Court Opinion, 3/17/14, at 8. Pursuant to Pa.R.E. 803.1(1)(b), and consonant with ***Wilson*** and ***Brown, supra***, Jackson's and Smith's prior statements to law enforcement, which were inconsistent with their trial testimony, were not "excluded by the rule against hearsay" because both declarants testified at trial and were subject to cross-examination, and their prior inconsistent statements were "writing[s] signed and adopted by" them. ***See Commonwealth v. Jones,*** 644 A.2d 177, 180 (Pa. Super. 1994) (affirming

admission of prior inconsistent statement of trial witness as substantive evidence because, *inter alia,* "the statement had been given by [trial witness] twelve days after the shooting of [decedent], at a time when the events had been fresh in the witness's mind and when it had been less likely that the witness had any motive for falsification").

Appellant's seventh and final issue claims the trial court erred in allowing Detective Bamberski to testify regarding the state of mind and hearsay statements of Henderson. *See* Appellant's Brief at 56. The trial court opined:

> Appellant mischaracterizes a small portion of Detective Bamberski's testimony concerning [Henderson's] demeanor at the preliminary hearing and alleges reversible error claiming that such testimony was incompetent and constituted inadmissible hearsay. Contrary to Appellant's claim, the Court limited the use of the testimony to relevant, non-hearsay issues. It sustained defense counsel's first objection and cautioned the jury as to the limited use of the testimony. We explained our reasoning at the time it occurred and we rely upon that reasoning expressed in the notes of testimony. See N.T. 7/20/12, 19-24.

Trial Court Opinion, 3/17/14, at 8.

Based on our review of the record, we find that the trial court did not abuse its discretion in admitting the challenged portions of Detective Bamberski's testimony. Detective Bamberski testified that Henderson "was afraid" on the day of her testimony at the preliminary hearing because "there had been some intimidation." N.T., 7/19/12, at 19. The trial court sustained Appellant's counsel's objection and instructed the jury as follows:

> [L]adies and gentlemen, obviously, [Henderson] is not here to testify today. The detective may have that information but, obviously, it's hearsay. You're not to consider it. You are to disregard that.

*Id.* While the trial court precluded Detective Bamberski from testifying about what Henderson "said to [Detective Bamberski]," the trial court ruled that Detective Bamberski could "describe what [he] observed about her demeanor in the courtroom, how she conducted herself, or anything else that would be a direct observation." *Id.* at 20. Detective Bamberski testified that Henderson's demeanor at the preliminary hearing "was fearful…for her safety." *Id.* at 23. Detective Bamberski further stated that Henderson "was sober. She was not someone who was abusing narcotics at that point." *Id.* We discern no trial court error of law or abuse of discretion in admitting this testimony. **See Johnson,** 838 A.2d at 673 (deeming a witness' testimony "not hearsay, since it does not involve an extrajudicial statement, but rather an observation based on [witness'] personal knowledge"). Moreover, the trial court's contemporaneous cautionary instruction to the jury ordering them to disregard hearsay testimony weighs against a finding of error. **See Commonwealth v. Walter,** 849 A.2d 265, 270 (Pa. 2004) (internal citation omitted) ("In a jury trial where the jury is instructed to disregard the information which was improperly brought to its attention, the impact of an error may be minimized so as to render it harmless.").

In sum, viewing the evidence in the light most favorable to the Commonwealth, and finding no trial court error of law or abuse of discretion, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/8/2014