J-S57009-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DENNISON REHM | |
| Appellant | No. 1525 EDA 2014 |

Appeal from the Judgment of Sentence November 25, 2013
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0001154-2013

BEFORE: MUNDY, J., OTT, J., and STABILE, J.

MEMORANDUM BY MUNDY, J.: **FILED NOVEMBER 23, 2015**

Appellant, Dennison Rehm, appeals from the November 25, 2013 judgment of sentence of four and a half to ten years' incarceration, imposed after a jury convicted Appellant of sexual assault, aggravated indecent assault, and indecent assault.[1]  After careful review, we affirm.

The trial court detailed the factual background leading to Appellant's convictions as follows.

> On May 11, 2012, [J.G.] reported to the Pennridge Regional Police Department ("PRPD") that she was raped by Appellant.  The investigation was conducted by Detective Daryl Lewis of PRPD.
>
> On Thursday, May 10, 2012, J.G. and a friend, [H.S.], went to sing karaoke at the Horse Tavern &

_____

[1] 18 Pa.C.S.A. §§ 3124.1, 3125(a)(1), and  3126(a)(1), respectively.

Grill in West Rockhill Township to celebrate the end of her spring semester at college. [H.S.]'s boyfriend drove J.G. and [H.S.] to the bar before it started at approximately 9:30 or 10:00, and the two stayed until karaoke finished later that night. J.G.'s boyfriend was supposed to join them at karaoke, but did not meet the two women there. Still, J.G. and [H.S.] chose to stay at karaoke without J.G.'s boyfriend.

Near the end of the karaoke session, J.G. and [H.S.] were joined by some of [H.S.]'s friends, including Appellant. J.G. and Appellant did not meet prior to that evening. The two interacted socially among the group of friends, with Appellant buying J.G. a drink while at the bar. J.G. possibly sat on Appellant's lap at some point during the night; however, there was no other physical contact such as kissing, hugging, or her placing her arms around him.

J.G., [H.S.], Appellant and two other friends then returned to [H.S.]'s boyfriend's house after karaoke ended. After arriving back at the house, which was a two bedroom trailer, the group shared a celebratory shot together. At this point, [H.S.]'s two other friends left for the evening and her boyfriend went to sleep in another room. J.G. then went to sleep on a futon in the living room. After J.G. was asleep, [H.S.] set up a sleeping bag for Appellant which she placed in the living room near the futon.

J.G. went to sleep alone, with her clothes on and hearing aid turned down, and did not consent to anyone touching her or having sex with her. She later awoke with her pants and underwear removed and with Appellant on top of her penetrating her vagina with his penis. J.G. told Appellant to stop and that she had a boyfriend. She tried calling to her friend in the other room for help, but Appellant used his hand to cover her mouth. Given Appellant's heavier weight and the fact that she was still feeling the effects of the alcohol she consumed that evening, J.G. could not remove Appellant from on

- 2 -

top of her body. After Appellant stopped having sex with J.G., Appellant helped with her underwear and leggings and then went to bed. J.G. then passed out and went back to sleep on the futon.

After waking up the next morning, J.G., [H.S.], and Appellant ordered pizza and other food, which J.G. did not eat much of. When Appellant left the house sometime in the early afternoon after eating, J.G. went to the bathroom and observed blood on a piece of toilet tissue that she had just used. Soon after, J.G. told [H.S.] what had happened the previous night, and J.G. then reported the incident to PRPD.

Detective Daryl Lewis of the PRPD conducted the investigation into J.G.'s claims against Appellant. The Detective transported J.G. to Doylestown Hospital for an exam, where [a specialized sexual assault nurse examiner] found evidence of multiple abrasions inside J.G.'s vaginal area that indicated blunt force trauma. Detective Lewis later conducted an interview with Appellant at Appellant's residence. When asked about J.G., Appellant denied having any knowledge of her. After observing a photograph, Appellant still denied recognizing her or having sex with her. Appellant never contacted Detective Lewis to revise his statements and declined to give his DNA when asked, accusing the police of going on a "fishing expedition."

The Detective obtained a search warrant for Appellant's DNA to test against the sample found on J.G.'s underwear that was preserved in the sexual assault kit. When Detective Lewis arrived to collect Appellant's DNA in accordance with the search warrant, Appellant stated that he would not voluntarily give the Detective a sample of his DNA. Appellant did not resist when the Detective collected his DNA, but he continually maintained that he was not voluntarily giving his sample. On November 16, 2012, Detective Lewis received the results of the DNA comparison from State Police, and Appellant was a match for the DNA recovered from J.G.'s

clothing. Appellant later admitted that he lied to Detective Lewis when questioned at his home. Appellant also contended that the sexual encounter was consensual, even going so far as to say J.G. not only instigated the encounter, but even acted "whorish" in their interactions.

Based upon the above evidence, the jury returned a guilty verdict on the charges of Sexual Assault, Aggravated Indecent Assault, and Indecent Assault.

Trial Court Opinion, 5/4/15, 2-5 (internal citations and footnote omitted).

In his appeal to this Court, Appellant presents us with the following two evidentiary issues.

A. Should the Commonwealth have been permitted to elicit testimony that Appellant refused to voluntarily submit a DNA sample?

B. Should defense witness, Dave Edelsberger, have been subject to cross examination on the topic of liquor code violations when they were not relevant to his credibility as a witness?

Appellant's Brief at 4.

We initially note that generally, a trial court's ruling on the admissibility of evidence will only be reversed upon a showing that the trial court abused its discretion. *See, e.g.*, *Commonwealth v. Buford*, 101 A.3d 1182, 1195 (Pa. Super. 2014) (citation omitted), *appeal denied*, 114 A.3d 415 (Pa. 2015). In particular, an appellate court may reverse a trial court's ruling on the admissibility of testimonial evidence only upon a showing that the trial court abused its discretion. *Commonwealth v. Randall*, 758 A.2d 669, 679 (Pa. Super. 2000). An abuse of discretion is

- 4 -

more than just an error in judgment, and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. **Commonwealth v. Randall**, 758 A.2d 669, 679 (Pa. Super. 2000), *appeal denied*, 764 A.2d 1067 (Pa. 2001).

In his first issue, Appellant asserts that his "refusal to comply with the warrant for a DNA sample should not have been presented to the jury as evidence of his guilt." Appellant's Brief at 11. Appellant maintains that "to allow testimony on the topic of Appellant's refusal to comply with a Commonwealth search warrant unfairly penalizes Appellant's good faith, if misguided, exercise of constitutional protections." **Id**.

The testimony to which Appellant refers is as follows.

> COMMONWEALTH: Mr. Brocco, you are employed as a law enforcement officer in Montgomery County; is that correct?
>
> OFFICER BROCCO: Yes.
>
> COMMONWEALTH: And on or about August 27, 2012, were you contacted by Detective Lewis here of the Pennridge Regional Police Department to contact [Appellant] regarding whether or not he would provide a DNA sample?
>
> OFFICER BROCCO: Yes.
>
> COMMONWEALTH: And did you, in fact, contact [Appellant] by phone to see if he would provide that sample?
>
> OFFICER BROCCO: Yes, I did.

COMMONWEALTH: And what was [Appellant's] response to you regarding providing that sample?

OFFICER BROCCO: First it was, I didn't have enough gas money to go up to Pennridge. And I provided him with a different meeting arrangement and he said that he wasn't willing to help with their fishing expedition.

COMMONWEALTH: And you relayed that information to Detective Lewis?

OFFICER BROCCO: I did later.

Appellant's Brief at 12-13, *citing* N.T., 7/15/13, at 74-75.

In addition, Appellant references the following testimony from Detective Lewis.

COMMONWEALTH: And describe the interaction between you and [Appellant] when you arrived at [Appellant's] home to serve the search warrant?

DETECTIVE LEWIS: I arrived at the residence. I went up to a landing. It is the second floor apartment. His mother was on the landing. I advised her that I need to speak to [Appellant]. She went inside and eventually [Appellant] came outside. I advised him that I had a search warrant to obtain a sample of his DNA.

COMMONWEALTH: What was his reaction to this?

DETECTIVE LEWIS: He advised that he was not going to voluntarily give me a DNA sample.

COMMONWEALTH: Did he use the term consent, voluntarily consent to a DNA sample?

DETECTIVE LEWIS: Correct.

COMMONWEALTH:     Did he give a reason as to why he would not consent to the DNA sample?

DETECTIVE LEWIS:     He advised that his attorney had advised him that he did not have to give a sample pursuant to the search warrant.

COMMONWEALTH:     Okay.  And what did you tell [Appellant], if anything, at that point?

DETECTIVE LEWIS:     I advised him the search warrant is a legal document that gives us a right to legally obtain the DNA sample.

COMMONWEALTH:     And describe the rest of the interaction between you and [Appellant].

DETECTIVE LEWIS:     At some point his mother went inside, came back outside and said she phoned their attorney and their attorney said that he should give the DNA sample.  At that point again he said he was not going to voluntarily give consent or give up his DNA.  I advised him that the search warrant states that we are entitled to it or we have a right to his DNA, and then he basically said that he was not— he was not resisting to give DNA, he was just not voluntarily giving it.  At that point I put rubber gloves, latex gloves on my hand, opened up two swabs and I swabbed the inside of his mouth for the DNA.

*Id*., *citing* N.T., 7/15/13, at 27-28.

Upon review, we conclude that the trial court did not abuse its discretion in admitting the foregoing testimony, and has ably addressed this issue in its opinion, referencing Pennsylvania Rule of Evidence 803(25) and voluntary extrajudicial statements.  **See** Trial Court Opinion, 5/4/15, at 10-12.   The trial court determined that each of Appellant's statements "represents an admission by a party opponent and was validly admitted into

evidence." *Id.* at 11. In addition, the trial court concluded that "even if Appellant's statements refusing to voluntarily give DNA evidence are protected by Pennsylvania law, they were still validly admitted into evidence as Appellant's counsel opened the door to their admission in her opening statement." *Id.* at 12. Accordingly, we discern no abuse of discretion by the trial court, and adopt the trial court's reasoning as our own in disposing of Appellant's first evidentiary issue. *See Buford*, *supra*.

In his second evidentiary issue, Appellant argues that the trial court erred in permitting his defense witness, Mr. David Edelsberger, who owns the Horse Tavern & Grill, to be cross-examined about liquor code violations "when they were not relevant to his credibility as a witness." Appellant's Brief at 20. Appellant maintains that the "Commonwealth eclipsed the bounds of permitted impeachment testimony when it commenced questioning on liquor code violations." *Id.* Although Appellant cites Pa.R.E. 607, noting that "[t]he credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by state of these rules," he otherwise fails to develop his argument, citing only one case, *Commonwealth v. Robinson*, 491 A.2d 107 (Pa. 1985), for the general proposition that "bias, improper motive, and prejudice are fertile grounds for impeachment of a witness's credibility." *Id.*

The Commonwealth recognizes the deficiency of Appellant's argument, stating that Appellant's "bald, unsupported statement does not serve to

provide him with a meritorious claim. It is therefore waived."

Commonwealth Brief at 24. We agree.

We recently detailed such waiver as follows.

> We need not reach the merits of [an] issue [where] the argument section of Appellant's brief merely consists of general statements unsupported by any discussion and analysis of relevant legal authority. Pennsylvania Rule of Appellate Procedure 2119 addresses the argument section of appellate briefs and provides, in part, as follows:
>
> **Rule 2119. Argument**
>
> **(a) General rule.** The argument shall be divided into as many parts as there are questions to be argued; and shall have ... such discussion and citation of authorities as are deemed pertinent.
>
> Pa.R.A.P. 2119(a).
>
> "The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority." *Estate of Haiko v. McGinley*, 799 A.2d 155, 161 (Pa. Super. 2002); Pa.R.A.P. 2119(b). "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." *Lackner v. Glosser*, 892 A.2d 21, 29–30 (Pa. Super. 2006) (citations omitted). This Court will not act as counsel and will not develop arguments on behalf of an appellant. *Irwin Union National Bank and Trust Company v. Famous and Famous and ATL Ventures*, 4 A.3d 1099, 1103 (Pa. Super. 2010) (citing *Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007)). Moreover, we observe that the Commonwealth Court, our sister appellate court, has aptly noted that "[m]ere issue spotting without

- 9 -

> analysis or legal citation to support an assertion precludes our appellate review of [a] matter." ***Boniella v. Commonwealth***, 958 A.2d 1069, 1073 n. 8 (Pa. Cmwlth. 2008) (quoting ***Commonwealth v. Spontarelli***, 791 A.2d 1254, 1259 n. 11 (Pa. Cmwlth. 2002)).
>
> Here, the argument portion of [Appellant]'s brief does not contain meaningful discussion of, or citation to, relevant legal authority. Appellant's Brief at 19–21. While the portion of the argument pertaining to [Appellant]'s issue does contain reference to case law regarding contents of the certified record, this section completely lacks any discussion or developed analysis relevant to the issue. This lack of analysis precludes meaningful appellate review. Accordingly, … we conclude that the issue is waived.

***Coulter v. Ramsden***, 94 A.3d 1080, 1088-1090 (Pa. Super. 2014), *appeal denied,* 110 A.3d 998 (Pa. 2014), *cert. denied*, ***Coulter v. Allegheny Cnty. Bar Assoc.***, --- S. Ct. ---, 14-1316 (2015).

Similarly, we find that Appellant in this case has failed to develop his second issue, such that we are precluded from meaningful review, and the issue is waived.

In sum, we find no abuse of discretion by the trial court with regard to the testamentary evidence challenged by Appellant in his first issue, and deem Appellant's second issue waived for lack of development. We thus affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/23/2015</u>

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :     CP-09-CR-0001154-2013

           v.                     :

DENNISON REHM                :

# OPINION

Defendant Dennison Rehm (hereinafter "Appellant") appeals this Court's November 25, 2013 Judgment of Sentence. We file this Opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

## PROCEDURAL HISTORY

On January 10, 2013, Pennridge Regional Police charged Appellant with Rape and related offenses. On July 16, 2013, a jury found Appellant guilty of Sexual Assault[1], Aggravated Indecent Assault[2], and Indecent Assault[3], convicting Appellant of all charges with the exception of Rape[4]. Sentencing was deferred for a Sexually Violent Predator Assessment by the Sexual Offenders Assessment Board.

On November 25, 2013, Appellant was sentenced to serve not less than four and one half (4 ½) years, nor more than ten (10) years, in a State Correctional Institution. On March 31, 2014, this Court held a hearing on Appellant's Motion for Reconsideration. Prior to the conclusion of

---

[1] 18 Pa.C.S. § 3124.1.
[2] 18 Pa.C.S. § 3125(a)(1).
[3] 18 Pa.C.S. § 3126(a)(1).
[4] 18 Pa.C.S. § 3121(a)(1).

the hearing, counsel for Appellant requested that this matter be denied as moot. On May 8, 2014, Appellant filed a timely Notice of Appeal to Superior Court.[5]

On May 28, 2014, this Court issued a 1925(b) Order directing Appellant to file a Concise Statement of Matters Complained of on Appeal within twenty-one days. Appellant did not file such a statement. On July 18, 2014, this Court filed an Opinion with Superior Court. On February 4, 2015, Superior Court issued an Order remanding the case so that Appellant could file a Concise Statement and this Court could file a Supplemental Opinion pursuant to Pa.R.A.P. 1925(a).

## FACTUAL BACKGROUND

On May 11, 2012, Jazmine Gonzalez ("J.G.") reported to the Pennridge Regional Police Department ("PRPD") that she was raped by Appellant. The investigation was conducted by Detective Daryl Lewis of PRPD.

On Thursday, May 10, 2012, J.G. and a friend, Holly Siffel, went to sing karaoke at the Horse Tavern & Grill in West Rockhill Township to celebrate the end of her spring semester at college. N.T. 07/12/13, pp. 10-11. Ms. Siffel's boyfriend drove J.G. and Ms. Siffel to the bar before it started at approximately 9:30 or 10:00, and the two stayed until karaoke finished later that night. N.T. 07/12/13, p. 12. J.G.'s boyfriend was supposed to join them at karaoke, but did not meet the two women there. Still, J.G. and Ms. Siffel chose to stay at karaoke without J.G.'s boyfriend. N.T. 07/12/13, pp. 13-14, 71-72.

Near the end of the karaoke session, J.G. and Ms. Siffel were joined by some of Ms. Siffel's friends, including Appellant. N.T. 07/12/13, pp. 13-14, 73-74. J.G. and Appellant did not meet prior to that evening. The two interacted socially among the group of friends, with

---

[5] Apparently, there was a defect in the letter containing Notice of Appeal as it was missing numerous items. On May 23, 2014, we received a Docketing Order from the Superior Court, otherwise we did not know of the Appeal. Hence the slight delay in our 1925 Order.

Appellant buying J.G. a drink while at the bar. J.G. possibly sat on Appellant's lap at some point during the night; however, there was no other physical contact such as kissing, hugging, or her placing her arms around him. N.T. 07/12/13, pp. 15-16, 74-76.

J.G., Ms. Siffel, Appellant, and two other friends then returned to Ms. Siffel's boyfriend's house after karaoke ended. After arriving back at the house, which was a two bedroom trailer, the group shared a celebratory shot together. At this point, Ms. Siffel's two other friends left for the evening and her boyfriend went to sleep in another room. J.G. then went to sleep on a futon in the living room. N.T. 07/12/13, pp. 18-19, 47, 77-78. After J.G. was asleep, Ms. Siffel set up a sleeping bag for Appellant which she placed in the living room near the futon. N.T. 07/12/13, pp. 77-79.

J.G. went to sleep alone, with her clothes on and hearing aid turned down, and did not consent to anyone touching her or having sex with her. She later awoke with her pants and underwear removed and with Appellant on top of her penetrating her vagina with his penis. J.G. told Appellant to stop and that she had a boyfriend. She tried calling to her friend in the other room for help, but Appellant used his hand to cover her mouth. Given Appellant's heavier weight and the fact that she was still feeling the effects of the alcohol she consumed that evening, J.G. could not remove Appellant from on top of her body. N.T. 07/12/13, pp. 20-23, 49. After Appellant stopped having sex with J.G., Appellant helped with her underwear and leggings and then went to bed. J.G. then passed out and went back to sleep on the futon. N.T. 07/12/13, pp. 24-25.

After waking up the next morning, J.G., Ms. Siffel, and Appellant ordered pizza and other food, which J.G. did not eat much of. When Appellant left the house sometime in the early afternoon after eating, J.G. went to the bathroom and observed blood on a piece of toilet tissue

3

that she had just used. N.T. 07/12/13, pp. 26-28, 80-81. Soon after, J.G. told Ms. Siffel what had happened the previous night, and J.G. then reported the incident to PRPD. N.T. 07/12/13, pp. 29-30, 82-84.

Detective Daryl Lewis of PRPD conducted the investigation into J.G.'s claims against Appellant. The Detective transported J.G. to Doylestown Hospital for an exam, where SANE[6] Nurse Susan Taylor found evidence of multiple abrasions inside J.G.'s vaginal area that indicated blunt force trauma. N.T. 07/12/13, pp. 213-15, 219-24. Detective Lewis later conducted an interview with Appellant at Appellant's residence. When asked about J.G., Appellant denied having any knowledge of her. After observing a photograph, Appellant still denied recognizing her or having sex with her. Appellant never contacted Detective Lewis to revise his statements and declined to give his DNA when asked, accusing the police of going on a "fishing expedition." N.T. 07/15/13, p. 75.

The Detective obtained a search warrant for Appellant's DNA to test against the sample found on J.G.'s underwear that was preserved in the sexual assault kit. N.T. 07/15/13, pp. 23-24. When Detective Lewis arrived to collect Appellant's DNA in accordance with the search warrant, Appellant stated that he would not voluntarily give the Detective a sample of his DNA. Appellant did not resist when the Detective collected his DNA, but he continually maintained that he was not voluntarily giving his sample. N.T. 07/15/13, pp. 26-28. On November 16, 2012, Detective Lewis received the results of the DNA comparison from State Police, and that Appellant was a match for the DNA recovered from J.G.'s clothing. N.T. 07/15/13, p. 29. Appellant later admitted that he lied to Detective Lewis when questioned at his home. Appellant also contended that the sexual encounter was consensual, even going so far as to say J.G. not

---

[6] A "Sexual Assault Nurse Examiner" is a specialized nurse who collects evidence and documents injuries for law enforcement when a sexual assault victim arrives in the emergency room for treatment. N.T. 07/12/13, pp. 182-83.

4

only instigated the encounter, but even acted "whorish" in their interactions. N.T. 07/15/13, pp. 119-20, 154.

Based upon the above evidence, the jury returned a guilty verdict on the charges of Sexual Assault, Aggravated Indecent Assault, and Indecent Assault. The Defendant was found not guilty of Rape.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

Pursuant to Pa.R.A.P. 1925(b), Appellant filed a Concise Statement of Matters Complained of on Appeal on March 24, 2015. Appellant's Statement raised the following issues, *verbatim*:

1. The Appellant was convicted following a jury trial in the above-captioned case on July 16, 2013, and thereafter sentenced on November 25, 2013, to 4 1/2 to 10 years of incarceration.

2. On appeal your Appellant will raise the following issues:

a. The Court erred in permitting evidence that the Appellant refused to voluntarily submit a DNA sample.

b. The Court erred in permitting Complainant's mother, Michelle Rosario, to testify that the Complainant was upset and did not tell her about the incident until Monday, May 13, 2013.

c. The Court erred in permitting the testimony of Joseph Borraco, who is identified as a Montgomery County Law Enforcement Officer, to testify that he contacted the Appellant to request that he submit a DNA sample and Appellant responded that he would not cooperate with a "fishing expedition."

5

d.    The Court erred in permitting the prosecutor to cross-examine bar owner, Dave Edelsberger, [sic] with respect to liquor code violations.

e.    The Court erred in sustaining the District Attorney's objection to the testimony of character witness, Jamie Mall, [sic] for Appellant's reputation for being peaceful and non-violent when she proceeded to explain the opinion of the community to include, *inter alia*, "wouldn't hurt a fly."

f.    The verdicts were against the weight of the evidence inasmuch as the Complainant exhibited flirtatious behavior with the Appellant in the time leading up to the alleged sexual assault and did not report the alleged assault until after the Appellant had rebuked her overtures. Further, no witnesses present in the home at the time of the alleged assault testified to hearing any sort of commotion.

## ANALYSIS

### I.    Sufficiency of the Evidence

Appellant contends that the evidence presented at trial was not sufficient to sustain the jury's verdict. We demonstrate herein that the Commonwealth presented sufficient evidence to the jury to prove beyond a reasonable doubt that Appellant committed the crimes of which he was convicted.

The Pennsylvania Supreme Court has articulated that the well-settled standard of review in judging the sufficiency of the evidence is whether, when viewing the evidence in a light most favorable to the Commonwealth as the verdict winner and drawing the proper inferences favorable to the Commonwealth, the trier of fact could reasonably have found that all of the elements of the crime were established beyond a reasonable doubt. Commonwealth v. Hagan,

6

654 A.2d 541, 543 (Pa. 1995); Commonwealth v. Heberling, 678 A.2d 794, 795 (Pa. Super.

1996). The Superior Court has elaborated:

> In applying [the above] test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Commonwealth v. Ventrini, 734 A.2d 404, 406-07 (Pa. Super. 1999) (citations omitted).

"Furthermore, it is well-established that even the uncorroborated testimony of the complaining

witness is sufficient to convict a defendant of sexual offenses." Commonwealth v. Bishop, 742

A.2d 178, 189 (Pa. Super. 1999).

Clearly, in finding Appellant guilty of Sexual Assault, Aggravated Indecent Assault, and

Indecent Assault, the jury believed the testimony of the Commonwealth's witnesses and accepted

the Commonwealth's evidence to the extent it established beyond a reasonable doubt the

elements of these offenses. Based on the foregoing facts and in viewing the facts most favorable

to the Commonwealth as verdict winner, it is apparent that the Commonwealth presented

sufficient evidence to the jury to prove beyond a reasonable doubt that Appellant committed the

offenses.

A person is guilty of Sexual Assault "when that person engages in sexual intercourse or

deviate sexual intercourse with a complainant without the complainant's consent." 18 Pa.C.S. §

3124.1.

The evidence in the light most favorable to the Commonwealth was sufficient to support the jury's finding that sexual intercourse occurred between Appellant and J.G. The jury heard the testimony of J.G. in which she detailed Appellant engaging in sexual intercourse with her. N.T. 07/12/13, pp. 21-22. Further, Appellant admitted to engaging in intercourse with J.G. in his testimony and further admitted that he had lied when he initially denied any such sexual contact in his interview with Detective Lewis. N.T. 07/15/13, p. 119. Lastly, evidence was also presented that Appellant's DNA matched the bodily fluids found on J.G.'s underwear that she wore the night in question. 07/15/13, p. 29. The evidence supported the jury finding that sexual intercourse occurred between J.G. and Appellant.

In addition, the evidence was sufficient for the jury to find that Appellant engaged in intercourse with J.G. without her consent. First, J.G. testified that after a night out with friends, she retired to Ms. Siffel's house and went to sleep on a futon in the living room. She further recalled that she awoke during the night to find Appellant on top of her, penetrating her vagina with his penis. J.G. testified that she attempted to call for help, but Appellant covered her mouth with his hand. She confirms that she did not consent to any such sexual contact with Appellant at any point during or before the attack. N.T. 07/12/13, pp. 20-23. The testimony of Nurse Taylor indicated that J.G. suffered internal abrasions to her vaginal area that were indicative of blunt force trauma, which she has seen in only an estimated five percent of exams that she has conducted. Ms. Taylor confirmed that her physical examination of J.G. revealed findings that were consistent with J.G.'s account of that evening. N.T. 07/12/13, pp. 213-15, 219-24. Conversely, Appellant testified at trial that the sexual contact was consensual, and J.G. instigated the encounter. N.T. 07/15/13, pp. 119, 152-54. Viewed in light most favorable to the

8

Commonwealth as verdict winner, the evidence was sufficient to sustain Appellant's conviction for Sexual Assault.

A person is guilty of Aggravated Indecent Assault Without Consent if he "engages in penetration, however slight, of the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith medical, hygienic or law enforcement procedures . . . without the complainant's consent." 18 Pa.C.S. § 3125(a)(1).

The evidence discussed above, which was sufficient to sustain Appellant's conviction for Sexual Assault, was also sufficient to sustain his conviction for Aggravated Indecent Assault. The testimony heard during the trial and the physical evidence recovered from the scene of the attack both support the jury's finding that penetration of the genitals of J.G. occurred without J.G.'s consent, and Appellant engaged in such penetration for a purpose "other than good faith medical, hygienic or law enforcement procedures."

A person is guilty of Indecent Assault Without Consent if he "has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant," and he does so "without the complainant's consent." 18 Pa.C.S. § 3126(a)(1). Indecent contact is "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person." 18 Pa.C.S. § 3101. "[I]t is clear from section 3101's plain meaning that 'indecent contact' occurs when there is proscribed contact with the female or male genitals." Commonwealth v. Capo, 727 A.2d 1126, 1129 (Pa. Super. 1999).

The evidence discussed above, which was sufficient to sustain Appellant's conviction for Sexual Assault and Aggravated Indecent Assault, was also sufficient to sustain his conviction for

9

Indecent Assault. The testimony heard during the trial and the physical evidence recovered from the scene of the attack both support the jury's finding that Appellant engaged in indecent contact with J.G. without her consent.

## II.    Evidentiary Issues

In his matters complained of on appeal, Appellant raises four claims concerning the admission of evidence at his trial. We begin our analysis by noting that the Pennsylvania Supreme Court has consistently held that the admission of evidence at trial is addressed to the sound discretion of the trial court, and such evidentiary rulings will not be disturbed absent an abuse of that court's discretion. See Commonwealth v. Champney, 832 A.2d 403, 416 (Pa. 2003); Commonwealth v. Ragan, 645 A.2d 811, 818 (Pa. 1994). Each of Appellant's claims will be discussed herein.

### A.  DNA Sample

In his first and third matters complained of on appeal, Appellant argues that evidence of his statements to police officers that he would not voluntarily submit to DNA testing was wrongfully admitted.

In Pennsylvania, it is clearly established that an admission by an opposing party can be used as substantive evidence. Pa.R.E. 803(25); Alessandro v. W.C.A.B. (Precision Metal Crafters, LLC), 972 A.2d 1245, 1252 (Pa. Commw. Ct. 2009). Moreover, "voluntary extrajudicial statements made by a defendant may be used against a defendant even though they contain no admission of guilt. The extrajudicial statements, which differ from confession in that they do not acknowledge all essential elements of a crime, are generally considered to qualify for introduction into evidence under the admission exception to the hearsay rule." Com. v. Kitchen, 730 A.2d 513, 519-20 (Pa. Super. 1999) (citations omitted).

10

Appellant seems to argue, however, that making statements refusing to voluntarily give DNA evidence is akin to a defendant asserting his right against self-incrimination. The right against self-incrimination, which is set forth in the Fifth Amendment to the United States Constitution, "protects an accused only from being compelled to testify against himself, or otherwise provide the state with evidence of a testimonial or communicative nature. Pennsylvania appellate courts have held that Article I, section 9 of the Pennsylvania Constitution offers a protection against self-incrimination identical to that provided by the Fifth Amendment." Commonwealth v. Conway, 534 A.2d 541, 546 (Pa. Super. 1987). More specifically, Pennsylvania courts have held that the "right against self-incrimination prohibits use of a defendant's pre-arrest silence as substantive evidence of guilt, unless it falls within an exception such as impeachment of a testifying defendant or fair response to an argument of the defense." Com. v. Molina, 104 A.3d 430, 451 (Pa. 2014).

In the case sub judice, the evidence at issue is two statements that Appellant made to police officers refusing to give a DNA sample on the advice of prior counsel. When Officer Brocco contacted Appellant by phone to request he voluntarily give a sample of his DNA, Appellant responded that he would not help the police with their "fishing expedition." Furthermore, when Detective Lewis attempted to execute a search warrant for Appellant's DNA, Appellant told the Detective that he would not relinquish his DNA voluntarily. Appellant did not resist the Detective, but maintained throughout the process that he was not acting in a voluntary manner.

Each of these statements represents an admission by a party opponent and was validly admitted into evidence. Pennsylvania law provides protections for a defendant's pre-arrest silence and any statements asserting that right. However, the right against self-incrimination only

11

protects against evidence of a "testimonial or communicative nature," not a defendant's right to not comply with search warrants or turn over physical evidence. Appellant's statements refusing to submit a DNA sample are not analogous to a defendant's statements asserting a Constitutionally-protected right.

Alternatively, even if Appellant's statements refusing to voluntarily give DNA evidence are protected by Pennsylvania law, they were still validly admitted into evidence as Appellant's counsel opened the door to their admission in her opening statement. "Where defense counsel opens the door to commentary on the defendant's pre-arrest silence, there is no Fifth Amendment proscription precluding the raising of that silence in fair response to defense argumentation. Commonwealth v. Adams, 39 A.3d 310, 320 (Pa. Super. 2012) aff'd, 104 A.3d 511 (Pa. 2014) (citations omitted). Appellant's counsel referenced Appellant's statements in her opening remarks, stressing that prior counsel advised Appellant to refuse the police access to his DNA sample. In making these comments to the jury, Appellant's counsel's tactical decision opened the door to the Commonwealth exploring these statements further. As such, it was not an abuse of this Court's discretion to admit testimony concerning Appellant's voluntary statements into evidence.

### B. Liquor Code Violations

Appellant complains that this Court abused its discretion by allowing the Commonwealth to cross-examine Mr. Adelsberger concerning past liquor code violations. This issue will be discussed below.

Pa.R.E. 607(b) permits the credibility of a witness to be "impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules." Pa.R.E. 401 further provides that evidence is relevant so long as it has any tendency to make a fact of consequence in

12

determining the litigation more or less probable than it would be without such evidence. Additionally, Pa.R.E. 403 permits a trial court to exclude otherwise relevant evidence so long as "its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

The investigating officers in this case were not able to receive a copy of the security camera footage from the night in question from Mr. Adelsberger, owner of the Horse Tavern & Grill. Mr. Adelsberger testified that his security camera video footage only lasts for five days before new footage is recorded over the old tapes, thereby destroying the formerly recorded footage. Evidence of past liquor code violations, which would include serving visibly intoxicated individuals, suggests to the jury that the bar has a history of such conduct. It also suggests that Mr. Adelsberger could have withheld those security tapes as they could have showed over-intoxicated patrons being served alcohol. This evidence has a tendency to show that J.G. may have been overly intoxicated on the night of the attack, as the bar has a history of possibly over-serving patrons and the security footage from that night might have showed her in an overly intoxicated and vulnerable state. Additionally, admitting the evidence does no prejudice to Appellant. As such, we submit that this Court did not abuse its discretion in admitting this evidence.

### C. Rosario's Testimony

As stated above, Pa.R.E. 401 provides that "evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action."

13

Michelle Rosario, J.G.'s mother, testified that J.G. did not tell her of the attack until the Monday after it occurred. She further testified that on Mother's Day that prior Sunday, she could tell that J.G. was not acting like herself, seeming quiet and distant. This evidence has a tendency to show that J.G. could have possibly been emotionally impacted by the attack, which would suggest that it was not a consensual encounter. However, the appropriate weight to give that evidence was for the jury to decide. This Court did not abuse its discretion in admitting this relevant and non-prejudicial evidence.

### D. Moll Character Evidence

Appellant's fifth matter complains of this Court's decision to sustain an objection to Appellant's character witness, Jamie Moll. This issue will be discussed herein.

Pa.R.E. 405(a) permits the admission of evidence concerning a person's reputation, providing "when evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation. Testimony about the witness's opinion as to the character or character trait of the person is not admissible."

Appellant specifically references an objection to Ms. Moll's testimony that Appellant "wouldn't hurt a fly." However, the Commonwealth did not make any objection to this testimony. The Commonwealth did object to a portion of Ms. Moll's testimony where, in reference to Appellant, she explained, "I trust him. I trust him around my six year old son." N.T. 07/15/13, p. 92. This Court sustained the Commonwealth's objection to that answer as it was testimony of the witness's personal opinion of Appellant's character, which Pa.R.E. 405(a) deems is inadmissible.

14

## CONCLUSION

For the foregoing reasons, this Court perceives that the issues of which Appellant has complained in this appeal are without merit, and that this Court's November 25, 2013 Judgment of Sentence was supported by both the law and the record in this case. We respectfully request the Superior Court to affirm this Court's decision.

BY THE COURT:

May 4, 2015
Date

WALLACE H. BATEMAN, JR. J.