J-S18044-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| NORMAN WALKER | No. 1902 EDA 2016 |

Appeal from the Order June 7, 2016
in the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):CP-51-CR-0005780-2013

BEFORE: PANELLA, SOLANO, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED APRIL 27, 2017**

The Commonwealth appeals from the order entered in the Philadelphia County Court of Common Pleas granting Appellee, Norman Walker's, motion for extraordinary relief for judgment of acquittal as to aggravated assault and criminal conspiracy to commit aggravated assault. The Commonwealth contends the evidence was sufficient to establish the elements of those offenses. We reverse and remand for resentencing.

The Commonwealth alleged that Appellee and a companion assaulted the complainant, during which Appellee stabbed the complainant on February 3, 2013. The Commonwealth's case was premised on the complainant's prior signed statement to the police. The trial court

---

[*] Former Justice specially assigned to the Superior Court.

summarized the relevant testimony presented at the non-jury trial before

the honorable Chris R. Wogan[1]

The trial court summarized the testimony presented at trial as follows:

> The complainant in this matter, Kenyatta Walker (hereinafter referred to as "Kenyatta" to avoid confusion with [Appellee] also surnamed Walker) refused to appear in court and accordingly was unwillingly transported to court by the police on March 9, 2015. Kenyatta testified that he did not remember the events of February 3, 2013, and that he had not made a police report. When asked if anything happened in early February 2013 that made him go to the 16th police district and make a police report Kenyatta replied "No." but later that something had happened to his wife and that he had not made a statement to the police. When confronted with his alleged statement, he, at first denied it was his signature. At that point, the prosecutor read the statement to the witness, and when asked to confirm, the witness stated first that he had "No comment" and then that he did not recall giving the statement.
>
> Detective [Jeffrey] Gilson testified that he took a statement from Kenyatta on February 5, 2013, after [Appellee] appeared, on his own, at Southwest Detective Division, concerning an alleged assault two days earlier. According to that account, [Appellee] and James Roi[st]er picked up Kenyatta in a blue Lexus, an argument ensued, after which [Appellee] and Roi[st]er exited the vehicle, opened Kenyatta's door and started beating on him. Kenyatta alleged in his statement that he thought they were playing until he felt [Appellee] stab him at which point he jumped out of the car and observed a gun in [Appellee's] other hand. The narrative declares that Kenyatta was stabbed four times in the hand. . . . The detective executed a search and seizure warrant of 4239

---

[1] Judge Wogan had retired and the case was assigned to the Honorable J. Scott O'Keefe before sentencing. *See* Trial Ct. Op., 9/9/16, at 2. Judge O'Keefe presided at the sentencing hearing and authored the trial court's Rule 1925(a) opinion.

West Girard Avenue in Philadelphia and although three guns were recovered, it was [Appellee's] son that was arrested, charged and tried for the weapons. No knife was recovered.

Laverne Ruth testified that the Girard Avenue address was her residence and that [Appellee] did not live there, only visited from time to time, and that the guns were hers, inherited from her deceased grandfather, and they had been in her closet for thirty-five years.

James Roister testified that although alleged to have been an accomplice in this case, he had never been arrested or even questioned about this alleged event, that he was indeed driving the car on February 3, 2013, and that an argument had started between [Appellee] and Kenyatta, that the complainant got out of the car and then left in a huff. Mr. Roister was positive that there had been no knife, no gun and that Kenyatta was not bleeding.

Trial Ct. Op. at 2-4 (citations omitted).

Following the non-jury trial,[2] Appellee was convicted of aggravated assault graded as a felony of the second degree,[3] conspiracy to commit aggravated assault,[4] possessing an instrument of crime[5] and simple assault.[6] Prior to sentencing, Appellee made a motion for extraordinary relief[7] seeking

---

[2] The trial was held on March 9, 2015, July 30, 2015 and August 18, 2015.

[3] 18 Pa.C.S. § 2702(a). **See** R.R. at 59a. For the parties' convenience, we refer to the reproduced record where applicable.

[4] 18 Pa.C.S. § 903.

[5] 18 Pa.C.S. § 907(a).

[6] 18 Pa.C.S. § 2701(a).

[7] Pennsylvania Rule of Criminal Procedure 704 provides:

judgment of acquittal for aggravated assault and conspiracy to commit aggravated assault. R.R. at 62a. The sentencing court granted the motion. *Id.* at 63a. This timely appeal followed.[8] The Commonwealth filed a Pa.R.A.P. 1925(b) statement of errors complained of on appeal and the trial court filed a responsive opinion.

The Commonwealth raises the following issue for our review:

> Did the lower court err in granting a post-verdict judgment of acquittal on the charges of aggravated assault and

_____

**(B) Oral Motion for Extraordinary Relief.**

(1) Under extraordinary circumstances, when the interests of justice require, the trial judge may, before sentencing, hear an oral motion in arrest of judgment, for a judgment of acquittal, or for a new trial.

(2) The judge shall decide a motion for extraordinary relief before imposing sentence, and shall not delay the sentencing proceeding in order to decide it.

(3) A motion for extraordinary relief shall have no effect on the preservation or waiver of issues for post-sentence consideration or appeal.

[8] We note that

> the government may appeal from a trial court's post-verdict order finding the evidence insufficient to sustain a jury's verdict and entering a judgment of acquittal in favor of the defendant. In the event an appellate court finds that the jury's verdict was supported by sufficient evidence, it may reverse the trial court's ruling and reinstate the jury's verdict without remanding for any further resolution of factual issues.

***Commonwealth v. Feathers***, 660 A.2d 90, 93–94 (Pa. Super. 1995) (*en banc*).

criminal conspiracy to commit aggravated assault where the Commonwealth's evidence fully established the elements of those offenses, and the lower court's contrary conclusion improperly rested on a credibility assessment of evidence it had not heard firsthand?

Commonwealth's Brief at 3.

The Commonwealth contends the sentencing court erred in granting the post-verdict judgment of acquittal on the charges of aggravated assault and conspiracy to commit aggravated assault by reweighing the evidence. The Commonwealth contends it "proved the elements of the offenses through Kenyatta's signed statement to the detective . . . ." *Id.* at 13.

> Specifically, Kenyatta told the detective that [Appellee] stabbed him four times in the hand with a knife, and only stopped the assault when Kenyatta pushed him away and ran off. The stab wounds to Kenyatta's hand, which eventually caused the hand to go numb, constituted bodily injury.
>
> *  *  *
>
> The evidence also established the elements of criminal conspiracy . . . . [Appellee] and Ro[i]ster conferred with one another immediately before [Appellee] went into his house to arm himself. Ro[i]ster then facilitated the stabbing by driving [Appellee] and Kenyatta around the corner . . . . Ro[i]ster and [Appellee] continued to act in concert after the stabbing by getting back into the car to either pursue Kenyatta or leave the crime scene.

*Id.* at 14-15 (citations omitted). Thus, according to the Commonwealth, the sentencing court vioated the standard of review by reweighing the evidence. *Id.* at 18-19. We agree.

Our review of a ruling granting a motion for judgment of acquittal is guided by the following principles:

> A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge. As we have stated:
>
>> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Graham*, 81 A.3d 137, 142 (Pa. Super. 2013) (citations and quotation marks omitted). "Following the rendering of a verdict, the trial court is limited to rectifying trial errors and cannot make redeterminations concerning credibility and the weight of the evidence."

*Commonwealth v. Johnson*, 631 A.2d 639, 643 (Pa. Super. 1993) (*en banc*) (citation omitted). Moreover, "a trial judge's authority over a nonjury verdict is no greater than the authority of a judge over a jury verdict." *Id.* at 642.

Aggravated assault graded as a felony of the second degree is defined as follows:

> **(a) Offense defined.**—A person is guilty of aggravated assault if he:

> \* \* \*

> (4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon[.]

18 Pa.C.S. 2702(a)(4). This Court in *Commonwealth v. Magnum*, 654 A.2d 1146 (Pa. Super. 1995), opined: "[A] knife is obviously a deadly weapon." *Id.* at 1150.

Criminal conspiracy is statutorily defined as follows:

> **(a) Definition of conspiracy.**—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. 903(a).

It is well-established that

> a prior inconsistent statement may be used as substantive evidence only when the statement is given under oath at a formal legal proceeding; or the statement had been reduced to a writing signed and adopted by the witness; or a statement that is a contemporaneous verbatim recording of the witness's statements.

**Commonwealth v. Lively**, 610 A.2d 7, 10 (Pa. 1992);[9] *accord*

**Commonwealth v. v. Brown**, 52 A.3d 1139, 1154 (Pa. 2012) (recognizing

---

[9] We note that the Pennsylvania Rule of Evidence 803.1 has been amended, effective April 1, 2017, and provides, *inter alia*, as follows:

> Rule 803.1. Exceptions to the Rule Against Hearsay— Testimony of Declarant Necessary
>
> The following statements are not excluded by the rule against hearsay if the declarant testifies and is subject to cross-examination about the prior statement:
>
> \* \* \*
>
> **Prior Statement by a Declarant-Witness Who Claims an Inability to Remember the Subject Matter of the Statement.** A prior statement by a declarant-witness who testifies to an inability to remember the subject matter of the statement, unless the court finds the claimed inability to remember to be credible, and the statement
>
> (A) was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition,
>
> (B) is a writing signed and adopted by the declarant, or
>
> (C) is a verbatim contemporaneous electronic recording of an oral statement.

Pa.R.Evid. 803.1(4). We note this new rule does not apply to the instant case.

that under **Lively**, an out-of-court inconsistent statement is admissible as substantive evidence); **Commonwealth v. Buford**, 101 A.3d 1182, 1201 (Pa. Super. 2014) (citing **Lively** with approval). Furthermore, this Court has previously held:

> [T]here is no requirement that a witness, at the time of trial, adopt his or her prior statement as being truthful in order for the statement to be admissible under [**Lively**]. If this were so, the statement would not be inconsistent with the witness's trial testimony and there would be no need to introduce the prior statement. The requirement of **Lively** is that a prior inconsistent statement, which has been reduced to writing, will be admissible as substantive evidence if the statement, at the time when it was made, was signed and adopted by the witness.

**Commonwealth v. Jones**, 644 A.2d 177, 180 (Pa. Super. 1994).

In the case *sub judice*, the sentencing court opined:

> The prosecution in this case relies solely on the words of Kenyatta to prove its case. While disavowing Kenyatta's testimony at trial, the assistant district attorney relies on the complainant's statement to a detective without an iota of corroboration. In his account to the police, Kenyatta claimed that [Appellee] stabbed him four times and threatened him with a gun. When discussing Kenyatta's credibility, Judge Wogan stated, "I completely agree with you on that Mr. Walker testified without credibility. I agree with you a hundred percent on that." Judge Wogan then dismissed the gun charges, clearly evidencing that he did not believe the complainant's testimony, nor the statement he made to the police. Walker claims to have been stabbed four times, yet never sought medical treatment, and more important, no one ever saw the alleged stab wounds. The detective taking the statement two days after the alleged incident did not see the purported stab wounds. The driver of the vehicle, who was never questioned or charged, stated unequivocally there was no knife and no stabbing. No medical evidence, no photograph, no corroboration of any sort was ever

- 9 -

produced. In dismissing the gun charges, Judge Wogan clearly showed his disbelief of Kenyatta's statement to the police, the only possible substantive evidence that could be the basis for any finding of guilt of any charge. During the defense attorney's closing arguments the following occurred:

> [Defense counsel]: When you lack credibility under oath, Your Honor, a verdict—

> The Court: That's something that should be taken into serious consideration, you're right.

Moments later, the court added, "That's troubling to the court." Clearly, the testimony and statement of Kenyatta were unworthy of belief by the trier of fact, and as such the interests of justice required the granting of the motion for extraordinary relief.

Trial Ct. Op., at 5-6 (citations omitted).

However, Kenyatta Walker testified, *inter alia*, as follows:

[The Commonwealth]: Mr. Walker, taking your attention back to February 3, 2013. Where were you that day?

A: I don't remember.

Q: You don't remember where you were?

A: Not exactly.

Q: Let me ask you this, back sometime in early February 2013, did you see anybody out in West Philadelphia that you see here in court today?

A: What do you mean?

Q: Do you see anybody here in the courtroom that you saw back in February 2013?

A: I thought this was supposed to be over. I said I didn't come here to testify against anybody. I didn't come here

to put charges on anybody. You had me picked up by a Philadelphia police officer and brought here.

* * *

Q: Why didn't you want to come in on your own?

A: Because I have nothing to say.

Q: Let's talk about what you had to say in February 2013. Did you speak with the police on February 5, 2013?

A: I don't know.

Q: Did anything happen to you in early February 2013 that made you go to the 16th district and make a police report?

A: No.

Q: Nothing happened to you. Do you recall being interviewed by a detective in February 2013?

A: Yeah.

* * *

Q: What were you interviewed about by Philadelphia detectives on February 5, 2013?

A: Something happened to my wife at—I don't know. Like I said, I'm not here to press charges. I'm not here to make no statement or nothing like that. I don't wish to be on the stand. Last year I was told I didn't have to be on the stand at all.

* * *

Q: What did you go speak with the detectives about on February 5?

A: I didn't speak to them about nothing.

Q: Do you recall giving a statement to the detectives back on February 5?

A: No. . . .

R.R. at 18a-19a.

The Commonwealth read from the statement and asked Kenyatta if he remembered the questions and his answers as they appeared in the statement. He stated that he did not remember giving the answers reflected in the statement. *See* R.R. at 21a-22a. Kenyatta testified that the signatures on pages two and three of the statement looked like his signature. R.R. at 23a.

The Commonwealth showed Kenyatta a photograph, marked C-3, which he identified as his hand. *Id.* He testified as follows:

[The Commonwealth]: Why was the hand bandaged?

A: I had a cut on it.

Q: How did it get cut?

A: I don't know offhand.

Q: You don't remember how your hand got cut resulted in bandages in that photo?

A: Not offhand I don't.

Q: Do you recall being asked a question: "did you seek medical treatment as a result of this incident?"

A: No, I didn't at the time.

Q: Do you recall the detective asking you that question?

A: No. I know I didn't go to the hospital for my hand until six days later.

Q: Who put the bandages on that are in C-3, photo?

A: My wife.

R.R. at 23a-24a.

Moreover, Kenyatta testified, *inter alia*, as follows in response to questions posed by counsel for Appellee:

[Appellee's Counsel]: How is it that you said you remember part of your statement and you don't remember part of your statement. The signature looks familiar and then it doesn't look familiar. How is it that you went to the police station? Did they pick you up or you went yourself?

A: It was this cop that my wife had knew, that's how.

\* \* \*

Q: Is it correct to tell the [c]ourt one thing about your injuries to your right hand. You never received any type of hospital treatment for those injuries, did you?

A: About four or five days later.

\* \* \*

Q: They were like four or five puncture wounds in your hand?

A: Yes.

\* \* \*

Q: With respect to winding up in the police station, do you remember going in there in February 2013?

A: Going where?

Q: Police station.

A: One of them days.

* * *

Q: Were you in this Lexus with this man and Face?

A: Yeah.

Q: Was there a beef going on or something like that or a fight?

A: A little altercation or something.

* * *

Q: The bottom line is, again you're under oath here today subject to perjury, this man, [Appellee], never cuts you, did he?

A: No.

R.R. at 25a-26a.

On redirect, Kenyatta testified as follows:

[The Commonwealth]: When defense counsel said the altercation was a verbal altercation, meaning words back and forth, you got out and left, you said yes to defense counsel that's all that happened, correct?

A: Yeah.

Q: It was only words, how did your hand get stabbed?

A: I don't know.

Q: Getting stabbed is a pretty significant deal, you went to the cops and told them about it, correct?

A: Yeah, I'm done with answering questions. I don't have to answer no more. That's it.

R.R. at 26a.

- 14 -

At trial, Detective Gilson testified as follows with respect to Kenyatta's statement:

I started the interview, My name is Detective Gilson. I will be interviewing you concerning a report that you made earlier today at the 16th Police District in reference to an incident that occurred on 2/3/13, at, approximately, 8:30 a.m. at Belmont and Girard Avenue.

The first question I asked was, Would you like to tell me what had—would you like to tell me what happened at that date and time? He responded, Two guys I grew up with, Tinsky (phoenetic), Norman Walker and Face, James Roi[st]er, picked me up in Face's blue Lexus. We were coming from a friend's house, drinking. We stopped by my house to check on my kids. We were all inside, had another few drinks, and then Tinsky said, let's go for a ride.

We drove to Tinsky's house at Belmont and Girard. . . . Me and Face got out of the car and said something to each other, and then Tinsky went into his house and came back out, about three or four minutes later. They got back into the car, and were up front talking to each other as I was on the phone with my wife.

They drove around the corner, in front of Lee School, right in front of the front. Face got out of the car, Tinsky got out of the car. Tinsky opened the door and started stabbing me. First I thought that he was playing, but then I felt him stab me. I pushed him and jumped out of the car. That's when I could see he had a gun in his other hand.

Face was standing there with his hands in his pockets looking at me, like, he was a being a lookout. I pushed off of him and ran. I ran straight up Belmont and made a right onto Girard Ave. They looked like they were going to U-turn and come after me, but there was lot of traffic and they just went off.

I then asked, what did Tinsky stab me with? He said it was a knife. The blade was silver. I couldn't tell what kind

of knife it was, but it was, about, five or six inches long. I asked, Can you describe the gun that he had? He replied, it looked like a Glock, it was all black, full sized. I asked, Did either Tinsky or Face saying anything to you while Tinsky assaulted you? He said, They were saying something but it wasn't registering. I wasn't sure whether they were trying to rob, or were pissed at me, or what.

Did either Tinsky or Face attempt to take anything from you during this incident? I ran. I thought that Tinsky was trying to go through my pockets, but I pushed him and ran.

Did either man threaten you before or during this incident? He said, No, they just jumped out and started getting at me. My chest was pounding and I thought I was going to die from a heart attack. I asked, where exactly were you when Tinsky began to assault you? He said, I was sitting in the back seat of Face's Lexus. I bled on his passenger door and down the side of the seat.

I asked, How do you know Tinsky? He stated, I grew up with him. I've known him for about 30 years. His real name is Norman Walker.

I asked, How do you know Face? He said, I grew up with him. I've known him for about 30 years, too. His real name is James Roi[st]er, he lives in Sharon Hill. . . .

\* \* \*

I asked, Did you suffer injuries as a result of this incident? And he stated to me, He had—I have about four stab wounds on my right hand. I asked, Did you seek medical treatment as a result of this incident? He stated, My wife is a nurse, she cleaned it up and bandaged it for me, but I haven't gone to a hospital, or anything. I may go later because my hands are numb.

\* \* \*

[The Commonwealth]: Now, after giving that—after giving those answers, did you give Mr. Kenyatta Walker the

- 16 -

> opportunity to review it and make any corrections, revisions or additions?
>
> A: Yes.
>
> Q: And did he actually take that opportunity to review it?
>
> A: Yes.
>
> Q: Afterwards, did he sign and date the bottom of every page.
>
> A: He did.

R.R. at 31a-32a.

Instantly, Kenyatta signed and dated the prior inconsistent statement. *See id.* at 32a. Therefore, the statement was properly admitted as substantive evidence. *See Lively*, 610 A.2d at 10; *Brown*, 52 A.3d at 1154; *Jones*, 644 A.2d at 180.

In the case *sub judice*, the sentencing court erred in reweighing the evidence and substituting its judgment for that of the fact finder in granting the motion for judgment of acquittal. *See Johnson*, 631 A.2d at 642-43. A motion for judgment of acquittal challenges the sufficiency of the evidence. *See Graham*, 81 A.3d at 142. In reviewing the sufficiency of the evidence, the court may not reweigh the evidence. *See id.* Therefore, we agree with the Commonwealth that Appellee was not entitled to relief.

Order granting the motion for judgment of acquittal reversed. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>4/27/2017</u>