J-S38037-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| MARCUS JACKSON | |
| Appellant | No. 808 EDA 2016 |

Appeal from the Judgment of Sentence January 22, 2016
in the Court of Common Pleas of Philadelphia County Criminal Division
at No(s): CP-51-CR-0009181-2014

BEFORE: GANTMAN, P.J., SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED DECEMBER 15, 2017**

Appellant, Marcus Jackson, appeals from the judgment of sentence imposed after a jury convicted him of third-degree murder,[1] two firearm violations,[2] and possession of an instrument of crime.[3] Appellant claims that the trial court erred in admitting the preliminary hearing testimony of an unavailable witness because he did not have an adequate opportunity to cross-examine the witness. We affirm.

The trial court summarized the pertinent facts as follows:

> Between 7:00 p.m. and 8:00 p.m. on April 25, 2011, [Appellant] double parked his mother's green Dodge Durango on the 1500 block of Irving Street in Philadelphia to purchase marijuana from "Da," his supplier. Da entered

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(c).

[2] 18 Pa.C.S. §§ 6106, 6108.

[3] 18 Pa.C.S. § 907.

the vehicle with his associates "Reek" and "Far" and exchanged punches with [Appellant] over a supposed drug debt. Alex Jefferson Jr. ["Jefferson Jr."] and [the victim, Leon McMillan,] observed the fight from down the street and rushed towards the Durango, where [the victim] punched [Appellant] several times through the Durango's driver side window. Alex Jefferson Sr., Jefferson Jr.'s father, restrained Jefferson Jr., who in turn restrained [the victim].

During the fight, [Appellant's] keys fell out of the Durango and onto the street. After [Appellant] stepped out of the vehicle to retrieve the keys, he shouted to the crowd, "I'll be back," and drove away.

[Appellant] met Wes[t]ley Richardson near the intersection of 52nd and Chancellor Streets, two blocks away. From there, [Appellant] drove the Durango to Funston Street, approximately one mile north of Irving Street, while [Westley Richardson] followed in his cream Lincoln Continental. At Funston Street, [Appellant] and [Westley Richardson] rendezvoused with Steffon Richmond and an unidentified accomplice. Approximately an hour-and-a-half after the fight, Richmond drove [Appellant] and the unidentified accomplice to 50th and Locust Street in the minivan, with [Westley Richardson] following in his Lincoln.

Richmond and [Westley Richardson] parked the vehicles at the intersection, after which [Appellant] walked towards Irving Street, one block south. A few moments after [Appellant] turned the corner onto Irving Street, [Appellant] called [Westley Richardson], who remained near the vehicles. [Westley Richardson] answered his phone and heard the sound of two to three gunshots from the other end of the line.

Jefferson Jr., who remained outside on the 5100 block of Irving Street after the fight, observed [Appellant] follow the victim as [the victim] walked west on Irving Street. As [the victim] turned to face 5107 Irving Street, Jefferson Jr. saw [Appellant] shoot [the victim] three times. As [Appellant] ran towards 51st Street, Jefferson Jr., rushed towards [the victim] and cradled him in his arms. [The victim] took three breaths and became unresponsive.

[Appellant] returned to 50th and Locust Street and entered the minivan, which sped away southbound on 50th

- 2 -

Street, with [Westley Richardson] in tow. From Spruce Street, one block South of Irving Street, Jefferson Sr. observed the minivan race past him, with [Appellant] seated in the vehicle. Jefferson Sr. walked north to Irving Street and saw his son cradle the bleeding [victim]. In a panic, Jefferson Jr. shouted "Pop, he came back," and that "the chumpy in the car" shot [the victim].

At 9:17 p.m., Officers Michael Kane and Jeremy Olesik responded to a radio call reporting shots fired and discovered [the victim] lying in a pool of blood on the street directly in front of 5107 Irving Street. Having observed gunshot wounds to the victim's upper chest, left, thigh, and right hand, Officers Kane and Olesik carried a non-responsive [victim] to the back of their squad car. Medics arrived and transported [the victim] to the Hospital of the University of Pennsylvania, where he was pronounced dead at 9:42 p.m.

\*\*\*

[Westley Richardson] and [Appellant] drove their vehicles to the area of 59th Street and Woodland Avenue. There, [Appellant] jumped into the backseat of [Westley Richardson]'s Lincoln, where he told [Westley Richardson] that he shot the [victim] and proceed[ed] to cut off his dreadlocks. Later that evening, [Westley Richardson] returned home, where he told his mother Donna Richardson that "Face," ([Appellant]), "did some dumb shit," and that the two should vacate the house to avoid retribution.

On April 28, 2011, Detective Greg Singleton interviewed [Westley Richardson] at the Homicide Unit. During that interview, [Westley Richardson] identified [Appellant] as "Face" and provided Detective Singleton with both his and [Appellant's] cell phone numbers. Based on this information, Officer Edward Fidler of the Philadelphia Crime Scene Unit investigated [Westley Richardson]'s Lincoln on May 3, 2011, and discovered four patches of matted, dreadlocked hair. On August 25, 2011, Detective James Burns interviewed [Westley Richardson], who described the events leading to the shooting and restated [Appellant's] confession to killing [the victim].

Trial Ct. Op., 4/19/16, at 1-5 (citations omitted).

Police detectives interviewed Jefferson Jr. about the shooting five times. However, it was not until after Appellant was arrested for the murder, and the district attorney's office thereafter relocated Jefferson Jr. and his family, that Jefferson Jr. informed the authorities that he actually saw Appellant shoot the victim. On August 14, 2014, both Westley Richardson and Jefferson Jr. testified at Appellant's preliminary hearing. At that time, Westley Richardson denied that he ever referred to Appellant by the nickname as "Face," and generally denied making the two previous statements to police.

Westley Richardson did not appear for trial, and the Commonwealth moved to read his preliminary hearing testimony into the record. The trial court inquired about Richardson's unavailability to testify for the Commonwealth. The Commonwealth called two police detectives who detailed their efforts to locate him.

Of relevance to this appeal, one detective testified that he spoke to Donna Richardson, Westley Richardson's mother, and reminded her that she was to appear at trial. On cross-examination, the detective acknowledged that Donna Richardson had given a statement to police, but that her statement was not disclosed to defense counsel before the preliminary hearing.[4] Defense

---

[4] The relevant portion of Donna Richardson's statement is as follows:

> Last night my son called me and it was just to tell me that he was staying out last night. That was about 10:30pm. Then tonight my son text me and said to get out of the house because them niggaz know where we all live. I reply

- 4 -

counsel made the following argument regarding his inability to cross-examine Westley Richardson at the preliminary hearing due to the Commonwealth's failure to produce Donna Richardson's statement:

> [DEFENSE COUNSEL]: We addressed the one [component] as far as efforts to locate whether or not they acted reasonably and towards that [sic].
>
> The second component is whether or not counsel at the prior proceeding in this case, a preliminary hearing, had a full and fair opportunity to cross-examine. The Commonwealth provided [Westley Richardson's] statement of 4/28/11. The Commonwealth provided to defense counsel, myself, [Westley Richardson's] statement of 8/25/11. They also provided me with his criminal extract up until that time.
>
> What they did not provide me with was DM-1, the statement of Donna Richardson taken on 4/26/11. That was not given to me at the preliminary hearing. Why is that relevant? Had I been given that statement, I would have been able to cross-examine [Westley Richardson] with statements that he gave to his mom on the day after -- in fact, that day of this incident that were inconsistent with the statements that he told the police that were given to me. For instance, in DM-1, on page one, four questions down to Donna, What exactly did your son tell you?

---

> and told him to call me and then I text back and said do we need to move or what do we need to do. And he asked, do you want to move? And I said, yes if things ain't right. And then I said to call me again because now I'm thinkin' that someone got his phone and I wanted to make sure that this was my son that was texting me. And he text me telling me that Face [Appellant] did some dumb shit last night. So he does call me and I said to him, what the hell was going on? And he said that, [Appellant] did some dumb shit last night and when I asked what it was that he wouldn't tell me. **And then [Westley Richardson] said that he wasn't with [Appellant]**.

Commonwealth's Exhibit 22, at 1-2 (unpaginated) (emphasis added).

**ANSWER:** Last night my son called me and it was just to tell me that he was staying out last night. That was about 10:30. Then tonight my son text me and said to get of the house because them -- I don't want to use that word -- N know where we all live. I replied and I told him to call me and then I text back and said, Do we need to move or what do we need to do? And he asked, Do you want to move? And I said, Yes, if things ain't right.

So why would you state those -- why would you make those comments to your mom? Why would you have to leave? Why would you have to move right away? Why would you have to tell your mom to pack up and let's get out of there unless you were there, unless you had some involvement, unless perhaps you knew more than what you were telling the police?

This is inconsistent with what he tells the police. Those statements, Your Honor, had I been provided the statement of Donna Richardson, the cross-examination may have gone something like this, [Westley Richardson] did you tell your mom that you needed to leave the area right away? If he says yes, then that would lead into further cross-examination. Why sir, if you weren't involved in this incident like you told the police in your statement that you weren't even there -- I will show where that is -- would you need to leave the area? Why would you need to get your mom out unless you thought you were in danger of retaliation?

So I didn't know that he told his mom to get out of town. His mom also told the police that she said to him, Do you want to move? And according to her, he said, Yes if things ain't right [sic].

On page two at the top, in the middle of this answer again, Your Honor, the statement from Donna Richardson says, [Westley Richardson] said that he wasn't with [Appellant].

N.T., 10/20/15, at 54-57.

Defense counsel then referred to Westley Richardson's second statement to police, which indicated that he was in the area of the murder scene, and argued:

> Do you see the inconsistency is what I am talking about here? It's not an innocuous harmless issue, I mean, you can't say I was there on one occasion and I was there to make sure [Appellant] wasn't rolled on and I went with him and he parked and got out of his van and they say to someone else, I wasn't there. Oh, by the way, we got to get out of town. I mean that is fodder for cross-examination. That is important cross-examination, and now despite their efforts to locate, I'm not able to do that. I am not able to show this fact finder that this man provided an inconsistent statement within an hour [of the murder].

*Id.* at 60-61.

The Commonwealth responded that Donna Richardson's statement was not vital impeachment evidence, noting:

> In [Westley Richardson's] first statement, which had been marked on page four, date of 4/28/11, Question No. 5, this is the question, [d]id you have a conversation with your mother Donna Richardson about what happened?
>
> I just told her to get out of the house after she told me that the screen was broke. I told her that Face [Appellant] did some dumb shit last night. I told her to get out of the house and go to my aunt's house. She asked me if I wanted to move and go to my grandmother's house.

*Id.* at 63.

The trial court granted the Commonwealth's motion to present Westley Richardson's preliminary hearing testimony:

> **THE COURT**: Okay, [defense counsel]. I agree with you there is information in there; however, what you did not address and what you can do is, if you choose, have an

> opportunity to actually impeach the witness. Once [Westley Richardson's preliminary hearing testimony is] read in, you can present his mother to elicit all that information.
>
> So I'm granting the Commonwealth's motion.
>
> If you want a bench warrant on [Donna] Richardson, I certainly have evidence on this record and I will issue one if you wish to call her in to impeach [Westley Richardson's preliminary hearing testimony]. But I do think that the Commonwealth has met its burden in this particular case. I'm going to permit that testimony.

*Id.* at 62. After discussing the matter with Appellant, defense counsel informed the court that he would not be calling Donna Richardson. Westley Richardson's preliminary hearing testimony was read into the record.[5]

On October 23, 2015, the jury convicted Appellant of the crimes enumerated above. On January 22, 2016, the trial court imposed an aggregate sentence of twenty-three-and-one-half to forty-seven years of imprisonment. Appellant timely filed a post-sentence motion for reconsideration of the sentence, which the trial court denied on February 2, 2016.

Appellant timely appealed from the judgment of sentence. Both Appellant and the trial court have complied with Pa.R.A.P. 1925. In its Rule

---

[5] The Commonwealth eventually compelled the presence of Donna Richardson at trial to obtain information regarding Westley Richardson's whereabouts. In addition, Donna Richardson testified that she had no recollection of speaking to homicide detectives shortly after the murder and denied making any statement to them. *See* N.T., 10/21/15, at 102-21. Defense counsel did not cross-examine Donna Richardson regarding her previous conversations with Westley Richardson. *Id.* at 121-22.

1925(a) opinion, the trial court suggested that defense counsel had a full and fair opportunity to cross-examine Westley Richardson at the preliminary hearing, and that defense counsel was, or should have been, aware of the alleged impeachment information based on the statements from Westley Richardson that the Commonwealth had disclosed. Trial Ct. Op. at 12.

Appellant raises the following issue on appeal:

> Did the trial court err by allowing the Commonwealth to introduce the preliminary hearing testimony of an unavailable witness where [Appellant] did not have a full and fair opportunity to cross[-]examine that witness at the preliminary hearing?

Appellant's Brief at 4.[6]

Appellant asserts that had defense counsel obtained Donna Richardson's statement that Westley Richardson told her he was not with Appellant when the murder occurred, defense counsel could have impeached Westley Richardson with regard to his second statement to police that he was in fact in the same area as Appellant "right before and right after the shooting." *Id.* at 9. According to Appellant, the denial of this opportunity to cross-examine Westley Richardson precluded the admission of Westley Richardson's preliminary hearing testimony at trial. *Id.* In addition, Appellant avers that the trial court "ignore[d] altogether the part of [Westley Richardson]'s

---

[6] Appellant does not challenge the trial court's conclusion that the Commonwealth made reasonable efforts to locate Westley Richardson.

statement to his mother that he was not with [Appellant] near the crime scene

[] before or after the shooting." *Id.* No relief is due.

Our standard of review is well-settled.

> "Questions regarding the admission of evidence are left to the sound discretion of the trial court, and we, as an appellate court, will not disturb the trial court's rulings regarding the admissibility of evidence absent an abuse of that discretion." An abuse of discretion is more than a mere error of judgment; rather, an abuse of discretion will be found when "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record."

*Commonwealth v. Pukowsky*, 147 A.3d 1229, 1233 (Pa. Super. 2016)

(citations omitted).

Our Supreme Court summarized the law regarding the admissibility of

an unavailable witness's prior testimony as follows:

> The exception to the hearsay rule which permits the admission of an unavailable witness's prior preliminary hearing is predicated on the indicia of reliability normally afforded by adequate cross-examination. But where that indicia of reliability is lacking, the exception no longer applies. Therefore, in order for prior testimony to be admissible in a subsequent proceeding as substantive evidence against the accused, there must have been a full and fair opportunity to cross-examine. The Commonwealth may not be deprived of its ability to present inculpatory evidence at trial merely because the defendant, despite having the opportunity to do so, did not cross-examine the witness at the preliminary hearing stage as he might have done at trial. However, where the defense, at the time of the preliminary hearing, was denied access to vital impeachment evidence, such as prior inconsistent statements of the witness or the witness's criminal record, a full and fair opportunity to cross-examine the unavailable

witness may be deemed to have been lacking at the preliminary hearing.

***Commonwealth v. Buford***, 101 A.3d 1182, 1195 (Pa. 2014) (citations and quotation marks omitted).

The record here reveals that although Westley Richardson placed himself near the scene of the murder when he gave his second statement, he denied the veracity of both statements and maintained that he had no involvement with the crime when testifying at the preliminary hearing. ***See*** N.T., 8/13/14, 7-77. Therefore, Westley Richardson's preliminary hearing testimony was not inconsistent with his statement to Donna Richardson.

Moreover, the information contained in Westley Richardson's first statement was substantially similar to the information contained in Donna Richardson's statement. In Westley Richardson's first statement, which Appellant received before the preliminary hearing, Westley Richardson asserted that he was on the highway coming back from the Springfield Mall when Appellant told him he "got jumped." Commonwealth's Ex. 23 at 2 (unpaginated). Westley Richardson responded that he could not do anything to help Appellant because he was not in the area. ***Id.*** at 3. After speaking to Appellant, Westley Richardson stated that he went home, washed up, and went to Wawa to eat. ***Id.*** He then went to see a girl in South Philadelphia after "riding around." ***Id.*** He did not go home because he was receiving threatening calls. ***Id.*** Additionally, Westley Richardson suggested he learned of the shooting when the victim's brother called him looking for Appellant. ***Id.***

at 3. He also acknowledged speaking with Donna Richardson the day after the shooting and telling her to leave her home. *Id.* at 4. Therefore, Westley Richardson's first statement suggests that he was not with Appellant at the time of the shooting and also told Donna Richardson to leave the home. Thus, we discern no basis to disturb the trial court's conclusion that the Commonwealth failed to produce vital impeachment evidence before the preliminary hearing. *See Buford*, 101 A.3d at 1195; *Pukowsky*, 147 A.3d at 1233.

Appellant's further reliance on *Commonwealth v. Bazemore*, 614 A.2d 684 (Pa. 1992), is misplaced. In *Bazemore*, while defense counsel cross-examined the witness at the preliminary hearing, defense counsel was unaware, and had not been informed, that the witness had made a prior inconsistent statement to police. *Id.* at 685. In addition, defense counsel did not know that the witness had a criminal record, or that the district attorney's office was contemplating filing homicide and conspiracy charges against him in connection with the same incident that gave rise to Bazemore's charges. *Id.* The witness' credibility was of "vital importance" in that case. *Id.* at 687-88. Under those circumstances, the Pennsylvania Supreme Court held that there was no fair and full opportunity for cross-examination.

No such circumstances exist in Appellant's case. A review of defense counsel's cross-examination of Westley Richardson reveals that defense counsel had a full and fair opportunity to cross-examine Westley Richardson.

In response to defense counsel's questions, Westley Richardson claimed that he had lied to police, and would have said anything to be able to leave from police custody. *See* N.T., 8/13/14, 94-112. Westley Richardson's first and second statements, both of which Appellant received before the preliminary hearing, contained similar inconsistencies as Westley Richardson's statement in Donna Richardson's undisclosed statement. Furthermore, Westley Richardson's credibility was not of "vital importance" in this case, as another witness, Jefferson, Jr., testified that he saw Appellant fire the shots that killed the victim.

In sum, our review of the record supports the trial court's determination that Appellant was not denied vital impeachment evidence necessary for a full and fair opportunity to cross-examine Westley Richardson at the preliminary hearing. Thus, we discern no error in the trial court's ruling that Westley Richardson's prior testimony was admissible as substantive evidence at Appellant's trial.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/15/17

- 13 -